IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CASE NO. _____

LORI ACKERMAN,

          Plaintiff,

v.

ELIZABETH NELAND, in her Individual
Capacity; AMBER BEDOW, in her Individual
Capacity; TRENTON WOOLERY, in his
Individual Capacity; ELIZABETH RALSTON,
as the Administrator of the Estate of John
Ralston; CLAY COUNTY, MISSOURI; and
FORENSIC MEDICAL OF KANSAS, LLC,

          Defendants.

**COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiff Lori Ackerman, by and through her attorneys with the law firm Pfeiffer Rudolf,

hereby complains of Defendants and alleges as follows:

**INTRODUCTION**

1.     On the evening of December 10, 2020, 47-year-old Smithville mother Lori

Ackerman frantically called 911 moments after her fiancé, Shannon Tate, shot himself in the head

just feet away from her in their shared home. She begged first responders to hurry and save Tate's

life.

2.     Upon arrival, police found Ackerman in a state of panic: she was terrified and

repeatedly banged her fists against walls as she sobbed and desperately urged on-scene personnel

to save her dying fiancé. She was so distraught that officers on the scene considered placing

Ackerman on a 96-hour hospital hold as she processed the trauma of what she had just witnessed.

3.     Instead, however, law enforcement took her to the police station, where detectives

preyed upon her traumatized and vulnerable state and subjected her to more than 16 hours of

interrogation, isolation, and detention.

1

4.     During this period, Ackerman repeatedly told her interrogators that Tate shot himself after a series of stressors left him in crisis. She asked again and again when she could be taken to the hospital to see him.

5.     But Lori Ackerman never saw her fiancé again. While Tate lay dying in the hospital, Defendant Detectives Elizabeth Neland and Amber Bedow inundated Ackerman with every tactic at their disposal to coerce her into confessing to a murder that did not occur. Neland and Bedow relentlessly interrogated and accused Ackerman throughout the night, falsely promising that Ackerman could see Tate if she gave the answers the detectives wanted. For hours, Ackerman repeatedly insisted that Tate died by suicide.

6.     As the night dragged on, Neland and Bedow fed her, detail by detail, a false inculpatory story of an accidental shooting that they urged her to repeat and adopt. After tentatively adopting the false story, Ackerman was locked in a suicide cell and stripped of her clothes. She was forced to wait for hours with no food or drink, isolated and afraid, unaware of Tate's condition or when the detectives would return to retrieve her.

7.     Even after their own crime scene analysis corroborated Ackerman's innocence, Neland and Bedow continued to lie, manipulate, and threaten Ackerman, this time insisting that Ackerman had intentionally shot Tate. Once again, Ackerman repeatedly attempted to contradict their accusations.

8.     Nearly 18 hours after Tate shot himself just steps away from Ackerman, Neland and Bedow succeeded in convincing Ackerman to repeat their false story that she killed Tate and blocked out the memory.

9.     Neland and Bedow then used Ackerman's confession, which they knew or should have known was false, to arrest and charge Ackerman with the murder of Tate. Throughout their

2

investigation into and prosecution of Ackerman, Neland and Bedow conspired with officer Trenton Woolery and forensic pathologist John Ralston to ensure that the physical evidence supported their theory of Tate's murder, and to ensure that evidence corroborating Ackerman's innocence was left uninvestigated or undocumented.

10.     Police released details of Ackerman's arrest to the local media, including a television station which published these details along with Ackerman's booking photo. The story of her arrest was also carried nationally through the AP Wires.

11.     Ackerman was jailed for more than a year and two months, then restricted on house arrest until her trial—two years later—in April 2024. She was never allowed to say goodbye to her fiancé nor attend his funeral.

12.     While incarcerated, she witnessed another inmate's suicide, the abuse of a wheelchair bound detainee, and lived with the threat of an uncontrolled outbreak of COVID-19 at the height of the pandemic.  She also missed out on funerals, birthdays and the ability to care for her ailing father.

13.     On April 8, 2024, Ackerman was acquitted by a jury. She had lived nearly three and a half years as an accused murderer, publicly shamed for killing Shannon Tate.

14.     The prosecution of Ackerman was based solely on Ackerman's false and coerced confession.

15.     Detectives Neland and Bedow knew that, at the time of her false confession, Ackerman was in the middle of a mental health crisis, which had begun when Tate shot himself.

16.     These detectives knew, or reasonably should have known, that Ackerman's confession was false. Ackerman's wrongful prosecution was the result of the named individual Defendants' wrongful and unconstitutional acts.

17.     Lori Ackerman brings this action against Defendants seeking monetary damages pursuant to 42 U.S.C. § 1983 for unlawfully arresting Ackerman, for failing to adequately investigate the death of Tate, and for depriving Ackerman of her right to due process of law, all in violation of the rights guaranteed Ackerman by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

## PARTIES

18.     Lori Ackerman is a citizen and resident of Smithville, Missouri, situated within the Western District of Missouri.

19.     Elizabeth Neland is, upon information and belief, a citizen and resident of Missouri. At all times relevant to the Complaint, Neland was employed as a detective with the Smithville Police Department and was acting under color of state law and within the scope of her employment with the City of Smithville and the Smithville Police Department. Neland is sued in her individual capacity.

20.     Amber Bedow is, upon information and belief, a citizen and resident of Missouri. At all times relevant to the Complaint, Bedow was employed as a detective with the Clay County Sheriff's Office and was acting under color of state law and within the scope of her employment with the Clay County and the Clay County Sheriff's Office. Bedow is sued in her individual capacity.

21.     Trenton Woolery is, upon information and belief, a citizen and resident of Missouri. At all times relevant to the Complaint, Woolery was employed as a police officer with the Smithville Police Department and was acting under color of state law and within the scope of his employment with the City of Smithville and the Smithville Police Department. Woolery is sued in his individual capacity.

4

22.     Upon information and belief, John Ralston died on November 20, 2022, and an estate was opened on his behalf. The administrator of Ralston's estate is Elizabeth Ralston. At all times relevant to the complaint, Ralston was employed by Forensic Medical of Kansas City and was acting as a state official when he conducted the autopsy of Shannon Tate and issued a report of that autopsy.

23.     Clay County is a municipal corporation organized under the laws of the State of Missouri. Upon information and belief, Clay County has purchased and maintained applicable policies of liability insurance and has thereby waived governmental immunity that might otherwise be available to Clay County and its personnel and officials, including but not limited to employees of Forensic Medical who act as state officials when conducting autopsies and issuing autopsy reports.

24.     Forensic Medical of Kansas, LLC ("Forensic Medical") (d/b/a Forensic Medical of Kansas City) is a corporation organized under the laws of Kansas, with its principal place of business located at 40 South 18th Street, Kansas City, Kansas. Forensic Medical of Kansas City is a citizen of Kansas. Forensic Medical of Kansas City is a subsidiary of Forensic Medical Management Services, which also operates in Topeka, Kansas; Texas; and Nashville, Tennessee.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

26.     Venue in the Western District of Missouri is proper pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

27.     Pursuant to the Seventh Amendment to the Constitution of the United States, Plaintiff hereby requests a jury trial on all issues and claims set forth in this Complaint.

## FACTS

### Ackerman & Tate's Relationship

28.     Ackerman and Tate knew each other from childhood. After their first marriages ended, the two of them turned to each other and fell in love. They each decided to give marriage a second try. At the time of Tate's suicide, Ackerman and Tate had recently moved in together and were planning their wedding.

29.     The relationship was supportive and loving. Ackerman and Tate were constant companions and best friends. They took long rides on Tate's motorcycle through back roads, enjoying the scenery and peace and quiet. Tate was close with Ackerman's father—the two of them would work on cars together, host barbeques, and practice shooting together at Ackerman's father's lake house, where they would shoot at clay pigeons or targets. Tate and Ackerman shared parenting responsibilities and relied on each other as they raised their teenagers from their previous marriages.

30.     In addition to being a devoted and involved mother, Ackerman had a successful career with Blue Cross Blue Shield of Kansas City. She was engaged with and active in her community, where she was respected and valued.

### Tate's Stressors Begin to Build

31.     In the weeks leading up to his suicide, 48-year-old Tate suffered significant personal and professional setbacks, overwhelming him and alarming his loved ones.

32.     After years of working at Central Power, Tate's role as a team supervisor at a local plant was eliminated. His job duties were reduced to driving materials from one location to another in a semi-truck. He was told he would drive only locally, so he would always be home in the evenings. To appease Tate's disappointment, the company told Tate he would be able to pick out whichever truck he wanted to shuttle materials.

6

33.     But those promises were not kept. Tate was assigned a company truck rather than being able to select the one he wanted. He was then forced into driving evening hours, and eventually required to take overnight routes. Tate was anxious and concerned that he might lose his job. He had no control over any of the diminishing of his responsibilities. Shortly before taking his own life, Tate was told he had to drive over Christmas, missing the holiday with his family.

34.     In the midst of this downsizing, Tate's relationship with his teenage daughter was also deteriorating. She frequently sent angry text messages and refused visits with Tate. Tate shared his exasperation and sadness at the loss of the father-daughter connection with Ackerman, turning to her for advice on how to mend their relationship.

35.     Tate's worry over his daughter caused him to question his other relationships as well. He began to fear that Ackerman would also leave him and deluded himself into believing she was seeking another partner. His jealousy extended to Ackerman's relationship with her son. Tate frequently expressed his insecurities, and Ackerman always reassured him and calmed his anxiety.

36.     The week before taking his life, Tate's spiraled into despair over his daughter, concerns about work, and his personal insecurities. Despite Ackerman's reassurance during this downward spiral, Tate left the house in a panic. He came back for his gun, but Ackerman stopped him, terrified that he would harm himself. The two had a meaningful conversation about Tate's issues, and Ackerman believed Tate was in a better place.

37.     The following week, on December 10, 2020, Tate received another blow: a dramatic cut to his pay. He left work for lunch and began drinking.

38.     Tate texted Ackerman from a bar: "[E]verything is starting to get to me … I will get/through or past it or [it] will be the death of me." Ackerman responded with support, her habit

7

when Tate was spiraling: "Well I am here for you and always will be. WE will get thru whatever it is TOGETHER."

## Tate Shoots Himself in the Head

39.    The same day Tate learned about his pay cut and spent his lunch drinking, he asked Ackerman to meet him at a bar after she finished work. They stayed at the bar for five hours.

40.    When they got home from the bar, Tate's insecurities overwhelmed him. He prodded Ackerman to prove the stability of their relationship while lamenting the other stressors in his life. Exhausted with the pattern of doubt and despair, Ackerman went to the bedroom, pulled Tate's handgun from under the bed, and placed it under her own chin.

41.    Ackerman did not know how to use a gun. She did not know how to load a bullet into the chamber, find the safety release, or cock the gun. Tate knew that Ackerman did not know how to use a gun.

42.    Ackerman let Tate take the gun from her hands.

43.    Ackerman left the bedroom and turned down the hall toward the kitchen.

44.    As she walked toward the kitchen, Tate said something to Ackerman. She started to turn back towards him. Then she heard a bang.

45.    Tate had put the gun to his head and shot himself in the right temple. It was 10:05 p.m.

46.    The bullet went straight through his head and through the wall in the hallway. There was no other damage anywhere in the home.

47.    Tate fell to the ground on the left side of his body. The gun fell in front of him.

8

48.     Ackerman raced to the phone and called 911. In hysteria, she stayed on the phone with the 911 operator, desperately trying to save Tate's life, until police arrived three minutes later.

49.     Police arrived with their body cameras turned on. From the moment police arrived, all of Ackerman's actions and the facts described in this complaint are recorded on video unless otherwise stated.

## Police Detain Ackerman

50.     Paramedics arrived on the heels of the police and immediately began to treat Tate. Meanwhile, Ackerman was in crisis. She screamed to the paramedics to save Tate, then collapsed on the stairs, and sobbed on the floor.

51.     Despite her traumatic state in the wake of witnessing her fiancé shoot himself, Smithville Police Officer Trenton Woolery demanded Ackerman talk to him. Through tears and hitched breath, Ackerman told Woolery what occurred over the course of the evening and told him that Tate shot himself. She told Woolery this information at least ten times.

52.     Ackerman was so distraught that, at one point, she repeatedly hit her garage door with bare hands. Bruising appeared on her wrists. Woolery witnessed this and did nothing to stop her from banging the door.

53.     Tate was taken to the hospital by ambulance around 10:40 p.m. Ackerman was in her son's car, waiting for him to drive her to the hospital behind the ambulance.

54.     Unbeknownst to Ackerman, Woolery told other officers on the scene that Ackerman's behavior was suspicious. The apparent basis for his suspicion was because Ackerman "would become more emotional when [he] asked what happened."

55.     Among those with whom Woolery spoke was Sergeant James Morgan. Rather than allow Ackerman to follow the ambulance to the hospital, Defendant Woolery and Morgan decided

9

to keep Ackerman on the scene until detectives arrived and discussed that she should go to the police station for questioning.

56.     When Woolery asked Morgan if Ackerman would go to the station voluntarily, Morgan responded: "I'm going to make it voluntary."

57.     Police officers forced Ackerman out of her son's car and put her in the back of a police cruiser. She sat in the back of the car for half an hour, watched by an officer in the driver's seat.

58.     Anxious as time continued to pass, Ackerman begged the officer in the driver's seat to let her go to the hospital to see Tate. The driver refused.

59.     Meanwhile, Detective Elizabeth Neland arrived at Ackerman's house and spoke to the officers on the scene.

60.     Morgan falsely told the other law enforcement officers on scene that Tate had a bullet wound in the middle of his forehead.

61.     The officers suspected that the bullet appeared to have an upward trajectory in the wall of the hallway; they then opined without evidence that this "upward trajectory" meant Tate was shot by someone shorter than him.

62.     Woolery told Neland that he witnessed Ackerman repeatedly hit the garage door, and mocked her response as "hysterical." The bodycam footage recorded the tone of Woolery's voice as he repeated this account to other officers, opining without audible concern that he believed she had broken her wrists, but never suggesting she needed medical attention.

63.     Because Ackerman was despondent, suicidal, and possibly suffering from broken bones, Neland and Woolery initially planned to place Ackerman on a 96-hour hold at the nearby hospital, based on Mo. Rev. Stat. § 632.305(3) (2023) ("A peace officer may take a person into

10

custody for detention for evaluation and treatment at a mental health facility for a period not to exceed ninety-six hours only when such peace officer has reasonable cause to believe that such person is suffering from a mental disorder and that the likelihood of serious harm by such person to himself or herself or others is imminent unless such person is immediately taken into custody.").

64. Instead, inexplicably, Neland and Woolery directed Ackerman to be driven to the police station for interrogation.

65. At the time Ackerman was taken to the station, all evidence at the scene corroborated Ackerman's repeated statements that Tate killed himself. No evidence suggested that he had been shot by Ackerman.

66. Ackerman waited for the detectives at the police station for nearly an hour. Again and again, she asked to go to the hospital to see Tate. Repeatedly she was denied.

**Hospital Records Corroborate Ackerman's Account**

67. When Tate arrived at the hospital, he was given a CT scan.

68. The scan revealed that Tate was shot in the right temple. The exit wound was on the left side of his head.

69. The radiologist report determined Tate suffered a "self inflicted gun shot to right side of head."

70. The CT scan and the radiology report were entered into Tate's medical records at 11:31 p.m.

71. Tate's doctor then relayed to Tate's daughter and Ackerman's son that Tate had died from a self-inflicted gunshot wound.

72. Woolery arrived at the hospital around 12:30 a.m. He swabbed Tate's hands to test for gunshot residue.

11

73.    The swabs were never tested.

74.    While at the hospital, Woolery repeated to the medical staff what he had told officers at the scene: he characterized Ackerman as hysterical, told medical professionals that she had murdered Tate, and described the crime scene as suspicious. He told them Tate suffered a gunshot wound to the front of the forehead.

75.    A nurse advised Woolery that there was no bullet hole in the middle of Tate's forehead.

76.    When Woolery asked more questions of the nurses, including what they knew about the entrance and exit wound, the nurses indicated that, because of the bandages covering Tate's head, they could only speculate. They further explained they did not know if there was any stippling or burn marks on either wound.

77.    Woolery did not ask the nurses for the results of the CT scan. He also did not ask to speak to Tate's doctor, who had already concluded that Tate died by suicide and shared this information with Tate's daughter and Ackerman's son.

78.    Woolery knew or should have known that a CT scan had been performed and that a radiologist report was in Tate's file.

79.    Woolery then made a phone call to the police station. Despite the radiology report that determined Tate suffered a "self inflicted gun shot to [the] right side of [the] head" and an exit wound on the left side, Woolery falsely advised the station that that the bullet entered the left side of Tate's skull and exited the right. Tate was right-handed. This false information was then used against Ackerman throughout her long interrogation.

80.    Woolery remained at the hospital. At 1:50 a.m., Woolery asked Tate's ICU charge nurse if she knew which wound was the entrance wound. The nurse advised she needed to check the CT scan report.

81.    In response, Woolery falsely told the ICU nurse that the ER nurses were certain the entrance wound was on the left side of Tate's head.

82.    Woolery did not ask the ICU nurse to see the CT scan report, or to tell him the results of the report.

83.    Woolery willfully and/or recklessly failed to take basic investigatory steps when he did not ask for the CT scan that confirmed which wound in Tate's head was the entry wound. Instead, in passing false information to other officers and medical professionals, Woolery acted recklessly and in bad faith.

### Ackerman's Coerced and False Confession

#### Neland and Bedow Make False Promises

84.    Defendants Neland and Bedow began to interrogate Ackerman at 12:19 a.m. She was still in tears and distraught. At that point, Ackerman's repeated requests to see her dying fiancé had been refused for more than two hours. She had been alone and isolated for more than an hour.

85.    For the next 14 hours, Neland and Bedow seized upon Ackerman's distress using manipulation and other coercive tactics to break her grip on reality.

86.    As Neland and Bedow began their interrogation, Ackerman was in an obvious acute mental health crisis. She sobbed as she answered questions and told the detectives she wished she had killed herself when she had the gun in her hand.

87.    Ackerman repeatedly asked to go to the hospital to see Tate. Neland and Bedow told her she could not leave the room by herself.

13

88. Ackerman repeatedly detailed the events of the evening. Over a dozen times she explained the following facts:

    a. Tate began feeling insecure about their relationship and she continuously assured him that she loved him.

    b. The argument over Tate's insecurity began at the bar, but Ackerman believed they had resolved the argument by the time they returned home.

    c. Tate started to debate Ackerman's feelings for him again when they got home.

    d. Tired of arguing, Ackerman went to the bedroom, grabbed the gun from under the bed, and held it at her own chin.

    e. Tate gently took the gun from her.

    f. Ackerman then left the bedroom and began walking toward the kitchen when she heard Tate say something.

    g. As she turned around to face him, the gun went off and she saw him fall to the ground.

89. Twenty minutes into the interrogation, and after repeating the same facts several times, Neland and Bedow told Ackerman to sign a Miranda waiver. They told her she was not under arrest.

90. Soon thereafter, Ackerman learned that Tate was not going to survive his injuries. She got up and left the interrogation to get to the hospital. Neland and Bedow chased her down a hallway and forced her back into the interrogation room.

91. Weaponizing her desire to see Tate, Bedow and Neland repeatedly promised Ackerman they would take her to the hospital as soon as they got the information they needed

14

from her. Ackerman continued desperately to answer the same questions over and over again so she could leave and see her dying fiancé.

92. Several times Ackerman offered her hands and arms to the detectives, telling them to test her for gunshot residue. The detectives refused to do so.

93. Ackerman also repeatedly told the detectives she would take a lie detector test. The detectives refused to order one.

<u>Neland and Bedow Coerce Ackerman Into Doubting Details of the Night</u>

94. Forty-five minutes into the interrogation, Neland and Bedow shifted their approach from inquiry to accusation. They told Ackerman that her memory of the details of her statement was unreliable and then proceeded to question her memory about almost every aspect of her account of the events leading up to Tate's suicide. This tactic was designed to cause Ackerman to lose confidence in her own memories and to make it easier for Neland and Bedow to manipulate her into accepting their theory that Tate's death was a homicide and not a suicide.

95. When Ackerman said she did not *hear* what Tate's last words to her were, Neland reframed her statement as "you don't *remember* what he said." Ackerman later adopted that narrative.

96. When Ackerman stated that Tate had the gun in his right hand, Neland and Bedow falsely insisted that the evidence proved that her memory was wrong. Ackerman eventually adopted the police narrative that Tate shot himself in the left side of his head.

97. When Ackerman explained that she was *standing* sideways in the hallway when the gun went off, Bedow and Neland later insisted that Ackerman said Tate was *holding the gun* sideways: "Earlier you said [the gun] was sideways... No, you said and I quote 'It was sideways.'" Ackerman never said that the gun was sideways.

15

98.     The detectives then began to convince Ackerman that she was lying about not seeing Tate shoot himself and that she could not accurately remember what she was telling the officers.

99.     The detectives also lied about their own role in the investigation to convince Ackerman she had a faulty memory and was confused. Bedow told Ackerman she and Neland had not been inside the house. Ackerman saw Neland in the house and challenged Bedow, looking to Neland and saying, "You were in there." Neland and Bedow denied that fact. They falsely told Ackerman that Neland did not go into the house and did not look around. Confused, Ackerman accepted their lie.

<u>Neland and Bedow then Coerce Ackerman into Doubting Her Entire<br>Memory of Events</u>

100.    Once the detectives successfully convinced Ackerman that she was wrong about many details of which she was previously confident, they began to attack Ackerman's memory of the entire night and series of events. They repeatedly questioned her about details and insisted she did not remember information that she had already provided multiple times.

101.    Neland challenged that Ackerman did not remember if she and Tate had struggled over the gun, saying: "So you don't remember if he, like, grabbed—forcefully grabbed the gun from you... or you can't remember how that happened?" Ackerman repeated that Tate took the gun from her without resistance, but the detectives did not accept that answer.

102.    Even though Ackerman clearly and continuously stated that she held the gun under her chin because she was stressed about their jobs, their relationship with their kids, and was tired of arguing with Tate, Neland insisted Ackerman could not remember why she felt suicidal, saying: "I'm going to know what pushed my button enough to where I was like, 'You know what? Screw it. I'm going to go get the gun under the mattress and I'm going to put it to my chin and

16

I'm going to tell him I'm going to kill myself.' I would know that. And I think you know what pushed you to that point and you're not telling us." After the detectives repeated this narrative that Ackerman did not know why she felt suicidal, Ackerman eventually began to adopt it.

103.     Despite Ackerman's repeated and detailed description of the events of the evening, Neland insisted: "So from the time you walked out of the kitchen to the time he shot himself, you really don't remember what happened?" Eventually, Ackerman began to adopt the narrative that she did not remember those details despite consistently repeating them before, saying she only remembered holding the gun to her chin and then being in the hallway when Tate shot himself.

104.     Still ignoring that Ackerman had repeatedly provided details about what happened before the gun went off multiple times, Neland asked: "How can you remember that [you were in the hallway when the gun went off] but you can't remember what happened right before that?"

105.     Even though Ackerman had explained multiple times that she and Tate had not struggled over the gun, both detectives repeatedly insisted that she could not remember whether that was true. Neland said: "So if you don't remember what he said to you, you don't remember whether he was naked or not, you don't remember what made you turn around. You don't—but you're telling me that you know for sure that there wasn't some kind of scuffle over the weapon and it accidentally went off. You remember that, but you don't remember anything else." When Ackerman responded that she knew there was no scuffle, Bedow falsely accused her: "You said you don't remember. What she's saying is you said you don't remember, so how can you say that you know what didn't happen?"

106.     Both Neland and Bedow repeatedly insisted that Ackerman had "blanks" in her story that she needed to fill in. Despite Ackerman repeatedly detailing what happened before Tate

17

shot himself, Neland and Bedow falsely insisted over and over again that Ackerman's recounting was vague, missing information, and did not make sense. They also began to suggest that Ackerman had "blacked out" memories.

Ackerman Shuts Down

107.    After hours of Neland and Bedow's manipulation, Ackerman was confused and beaten down. She adopted the detectives' narrative that that she did not remember small details of what happened, but she still maintained that she knew Tate had shot himself.

108.    Around 3:30 a.m., more than three hours into the interrogation, Neland and Bedow took Ackerman's phone from her. Ackerman told them to look at her text messages to see Tate's concerning texts showing he was mentally unwell. Neland and Bedow did not open the phone.

109.    Without her phone, Ackerman was now further isolated, unable to speak with her son or receive updates on Tate's condition.

110.    Ackerman began to shut down, telling the detectives that she could not tell them any more information. She kept repeating that she was trying to "figure it out" but that she had gone through a traumatic experience.

111.    But there was nothing for Ackerman to "figure out." She had told the detectives the truth over and over again. The truth was corroborated by evidence readily available to the detectives. But Neland and Bedow kept insisting her statement was a lie, that it did not make sense, and that it was riddled with "blanks." They had successfully convinced Ackerman that she did not remember what happened, even though she told them exactly what had happened for hours. Exhausted, confused, sleep-deprived, and traumatized by her fiancé's suicide, Ackerman was primed for the final step in the detective's plan: manipulating Ackerman into admitting that Tate had not killed himself but that she had killed Tate.

18

<u>Detectives Increase the Pressure and Coercion on Ackerman</u>

112.    With the detectives' manipulation still not getting them the false answers they wanted, they increased the pressure on Ackerman. In addition to continuing to insist that Ackerman could not remember details, they engaged in the following coercive tactics:

    a.  Falsely insisting that evidence—which they did not have—contradicted Ackerman's statement: the detectives said "the phone, the house, Shannon's injuries, all tell a story" that was not consistent with what Ackerman told them;

    b.  Intimidating Ackerman, including Bedow telling Ackerman that she was a "certified voice analyst" and, without conducting any actual analysis, falsely stating she could tell that Ackerman was lying even without a lie detector test;

    c.  Telling Ackerman that if people heard that Tate had shot himself, he would look like a "crazy dude that got mad and shot himself," and that Ackerman did not "want him being remembered as somebody that killed himself"—all while telling Ackerman that if she admitted to shooting Tate, people would "respect" her for telling the "truth."

<u>Neland and Bedow Feed Ackerman a Story that She and Tate Struggled<br>Over the Gun</u>

113.    Throughout the interrogation, Neland and Bedow falsely insisted that Ackerman and Tate must have struggled over the gun when Tate took it from her. The detectives also insisted that the gun went off accidentally during that struggle, and that the struggle caused Tate's death.

114.    This narrative conflicted with the known evidence. Tate had no injuries to his hands or body other than the gunshot wound, Ackerman had no injuries to her body other than the bruises on her wrists from the garage door, and there was no sign of struggle in the home, which Neland had thoroughly walked through.

19

115.    Neland and Bedow's insistence on a struggle was also contradicted by Ackerman's repeated statements that there was no struggle between her and Tate.

116.    Just before 5:00 a.m., nearly seven hours after Tate had shot himself, Neland successfully convinced Ackerman that she did not remember if there was a struggle or not:

> Det Neland: ... Your finger's on the trigger. Your finger's on the trigger and he
>         grabs and it pulls it; there's a really, really, really good chance that it's going
>         to accidentally go off. Lori. Lori. Look at me. It's ok.
> Ms. Ackerman: You're telling me that I shot my --
> Det Neland: I'm not telling you --
> Ms. Ackerman: Yes, you are.
> Det. Neland: I'm asking you if that's what happened.
> Ms. Ackerman: I don't know. I don't know.
> Det. Neland: It's okay.
> Ms. Ackerman: I don't—it's not okay. It's not ok if you're telling me that.
> ...
> Ms. Ackerman: I don't... I said I don't remember that. I don't remember any of that.

117.    Seeing their opportunity to get Ackerman to say what they wanted, Bedow and Neland immediately pressured Ackerman to keep going, telling her they would "go through this together so we can get you down to see your fiancé."

118.    The detectives then showered Ackerman with praise, saying that people would respect her if she told the "truth" and that they would "be with [her] the whole way."

119.    When Ackerman stated she had been trying to tell the truth, Bedow told her: "You tell me what to do to walk you through this, I will. I will help you as much as I possibly can."

<u>Detectives Coerce Ackerman Into Confessing to Accidentally Shooting
Tate During a Struggle</u>

120.    Exhausted and realizing that the detectives would never let her leave to see Tate if she continued to tell the truth—that Tate had shot himself—Ackerman began to repeat Neland's version of an accidental shooting.

20

121.     As Ackerman began parroting the words fed to her, Bedow inched closer. Ackerman stated that she had the gun, that Tate was trying to stop her from killing herself, and that the gun went off and she panicked and ran down the hall.

122.     Bedow then began to exert physical pressure on Ackerman, feigning concern for her well-being and pretending to comfort her by rubbing her hand on Ackerman's back.

123.     As she pressed on Ackerman's back, Bedow asked Ackerman to repeat the manufactured story again, using the false promise that she would take her to see Tate once Ackerman did so.

124.     Ackerman repeated the false story of the gun going off during a struggle. Evidencing the effectiveness of the detectives' deception, Ackerman then told the detectives: "Thank you for opening up my mind."

125.     Immediately, Ackerman asked if she could see Tate. Bedow then pulled the rug out from under her, stating: "I don't know." Ackerman crumbled.

126.     The detectives then took Ackerman's clothes, forcing her to wear nothing but a medical gown.

127.     They then continued to interrogate her, asking about the bruises on her arm. Ackerman's lost connection to reality was apparent when she explained that the bruises were from her and Tate's struggle over the gun, and that the two of them hit the door jam.

128.     Both detectives knew that this was not true: Woolery told them he watched Ackerman forcefully hit the garage door, and he was concerned she broke her wrists. Ackerman confirmed at the beginning of the interrogation that the bruises were from hitting the garage.

129. After Ackerman adopted their story that her bruising was from a struggle, Neland and Bedow stopped the video recording of the interrogation. Neland and Bedow then moved Ackerman in her hospital gown to a small, bare room.

130. Neland and Bedow turned the video back on nine minutes later. There are no notes, reports, or records of any kind documenting what conversations, if any, occurred during those nine minutes.

131. With the video on again, Neland and Bedow then asked Ackerman to explain why the bullet entered the wall in an upward trajectory. Ackerman parroted the false police theory from earlier in the night: that the gun was pointed up because Tate was taller than her.

132. It was now 6:17 a.m. Ackerman had not slept in more than 24 hours. She had not eaten since her lunch the day before.

133. Ackerman had been interrogated for six straight hours.

134. The detectives kept Ackerman isolated from her family and all avenues of support during a mental health crisis.

135. The detectives procured false statements knowing they were false. They knew Ackerman was traumatized—they had considered placing her on a 96-hour psychiatric hold *before* they started interrogating her. They knew their tactics were causing her to lose her grip on reality.[1] They refused to obtain readily available evidence—the CT scan, gunshot residue swabs

---

[1] For decades, studies have shown that the tactics used by Neland and Bedow are likely to cause false confessions. A 2009 article explained that the tactics used here are likely to cause what is known as a "persuaded false confession." To obtain such a false confession, police engage in three coercive steps: First, they cause the suspect to doubt her innocence by accusing her of committing the crime, attacking her denials, and providing fabricated evidence of her guilt. Second, once the suspect is beaten down into realizing the police will not accept her innocence, the suspect may offer that she has no memory of the crime, which the police will attempt to explain by suggesting the suspect had a "blackout" or "repressed" her memory. Third, once the suspect believes she does not remember the crime, she will falsely confess to the crime, usually in a narrative that is "replete with errors." Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 J.

from her arms, or her text messages—all of which corroborated what Ackerman told them again and again: Tate committed suicide.

**The Detectives' Coercive Tactics Continued**

136.    The detectives knew that, though they had successfully manipulated Ackerman into adopting their version of an accidental death, her statements would not support a charge of intentional homicide.

137.    Based on Ackerman's false confession to an accidental shooting, Neland and Bedow placed her on a 24-hour hold for aggravated assault.

---

Am. Acad. Psychiatry & L. 332, 339–40 (2009), https://jaapl.org/content/jaapl/37/3/332.full.pdf.

Moreover, a recent article summarized the plethora of long-standing research to conclude that there are four situational risk factors associated with false confessions, all of which are present here:

(1) Prolonged custody and isolation: There is an enhanced risk of false confession when interrogations last over 6 hours and when the suspect is deprived of sleep, causing increased suggestibility and production of false memories;

(2) Presentation of false evidence: This includes presenting false evidence of guilt, interrupting the suspect's proclamations of innocence, and countering the suspect's objections to police theories; even police bluffing that they have obtained evidence when they have not yet done so can greatly increase a suspect's likelihood of falsely confessing because the suspect believes the evidence will exonerate them;

(3) Minimization themes that imply leniency: When police repeatedly minimize the crime of which the suspect is accused, for example, by saying it was an accident or the suspect deserved it, the minimization acts as an implied promise of leniency and significantly increases the risk of a false confession;

(4) Innocence: Innocent suspects are more likely to confess because they believe they have nothing to fear by talking to the police.

Saul M. Kassin et al., *Police-Induced Confessions, 2.0: Risk Factors and Recommendations*, 49 Law & Human Behavior 7, 15–19 (2025), https://psycnet.apa.org/fulltext/2025-79126-001.pdf.

The same article noted that several personal risk factors are likely to result in false confessions. *Id.* at 19–22. Ackerman exhibited several of these factors, including that she was highly suggestible and compliant and was suffering from posttraumatic stress symptoms. Neland and Bedow knew about these risk factors and knew or should have known that their tactics were causing a false confession.

138.     She was then moved to the Clay County Jail. While on the 24-hour hold, Ackerman was prohibited from making any phone calls—not to her son, not to an attorney, not to anyone. Because of her obvious mental health crisis, Ackerman was placed on suicide watch.

139.     Before being placed into a suicide-watch cell, Ackerman was forced into a short, sleeveless padded apron, called a "pickle suit," with no clothing underneath. Further isolated, this loss of dignity put Ackerman deeper into despair. She believed there was no way she would get help as she descended emotionally and began to give up hope that she would see Tate.

140.     While in the suicide watch cell, Ackerman had no food or water. The cell was filthy. It contained only a toilet, bare mattress, and comforter. The bright lights remained on at all times. She could not sleep. She was not allowed to shower. There was a tiny window at the top of the cell, but it was so small she could not tell if it was day or night. A man in a neighboring cell, who was also suffering from a mental health crisis, screamed and moaned the whole time Ackerman was held in the cell. She was terrified, alone, and feared what would happen to her next.

### Neland and Bedow Visit the Scene and Find No Evidence Contradicting Ackerman's Original Statement

141.     While Ackerman waited in suicide watch, Neland and Bedow went to the scene of Tate's suicide to investigate.

142.     Upon information and belief, Neland and Bedow were seeking evidence to support either the false narrative they coerced from Ackerman or a new theory that she had intentionally killed Tate.

143.     Neland and Bedow again found no evidence of a struggle over the gun before it went off.

24

144.     Upon information and belief, crime scene technicians told Neland and Bedow that the bullet's location in the wall was not indicative of its trajectory as it entered Tate's head, and that the bullet likely had its trajectory altered after entering Tate's head.

145.     All the evidence corroborated Ackerman's initial report that Tate shot himself.

146.     Neland and Bedow found no evidence to support the false statements regarding an accidental shooting they coerced from Ackerman. They found no evidence that Ackerman had intentionally killed Tate.

### Detectives Coerce Ackerman into Confessing to Murder

147.     Armed with nothing to support the false narrative of an accidental shooting, Neland and Bedow drove to the Clay County jail to continue their interrogation of Ackerman.

148.     By the time they arrived at the jail, it was 2:07 p.m. on December 11, the day after Tate shot himself.

149.     Ackerman was still in the pickle suit in suicide watch when Neland and Bedow returned. Ackerman had been awake for more than 32 hours.

150.     The detectives brought Ackerman into a small bare room. They positioned themselves in front of the only door, blocking Ackerman from exiting. Then they resumed their interrogation.

151.     Trapped in the small, windowless room in her pickle suit, Ackerman was helpless and hopeless. She had no control over what was happening to her. She was humiliated. She was exhausted, hungry, and her wrist throbbed. She still had no idea whether Tate was alive or dead.

152.     Neland and Bedow dove into accusations. They insisted Ackerman's confession to an accidental shooting—which took six hours to coerce—was false. They now insisted that Ackerman intentionally shot Tate in the head.

153.   The detectives told Ackerman that the evidence at the house did not match Ackerman's coerced, false statement that Tate had been shot when the gun went off during a struggle. Bedow told Ackerman: "So we went to the house and it's telling us a whole different story than what you are. So now is the time for us to put it all on the table what really happened."

154.   Ackerman returned to the truth—that Tate shot himself. The detectives rejected the truth, insisting it "did not make sense" for Tate to kill himself because he had "normal stresses."

155.   The interrogation video shows Ackerman attempting to regain clear thought. As she began to list off what she remembered, the detectives stopped her, saying:

> Det. Bedow: It's not even about remembering, Lori. You know.
> Ackerman: No, I don't.
> Det. Bedow: Yes, you do. This is it, right here, right now. This is it. When we walk out that door, that's it. It's just like I told you, we have a story that's not matching up with yours. And what does that mean? Who's that a problem for?
> Ackerman: Mine.

156.   These threats made clear to Ackerman that bad things would happen to her if she did not agree with the detectives' false version of events.

157.   Neland then lied to Ackerman that "phone records, DNA, [and] blood splatter" did not match Ackerman's initial statements.

158.   Phone and text records corroborated Ackerman's statement that Tate had shot himself. There was no DNA or blood spatter evidence at this time—nor was there ever blood spatter evidence.

159.   Desperate to provide the detectives with answers, Ackerman then restated her previous false confession that Tate was shot accidentally when he tried to take the gun from her.

160. The detectives rejected Ackerman every time she tried to give the same statement that they had coerced from her just hours before, saying: "That's not how it happened and you know it," and "That doesn't work."

161. The detectives insisted Ackerman was lying no matter what she said. They continuously peppered her with aggressive questions, mocked her concern for Tate's mental health, and were impatient with her every time she tried to answer their questions.

162. When Ackerman attempted one last time to say that Tate had died during a struggle, the detectives admitted they knew all along that there could not have been a struggle. Bedow told Ackerman:

> If he wanted to get that gun away from you, he would. And I don't imagine it would take much. He's twice the size of you; he's a man, which means he's twice as strong as you. So if he wanted to get that away from you, he would. So you guys weren't struggling over the gun. So how about we start over and you tell us what really happened.

163. Finally, after more than 14 hours of the detectives' coercion and 16 hours of custody, Ackerman gave up. The detectives successfully manipulated Ackerman into falsely confessing to a murder that did not occur.

164. Believing she had no choice, Ackerman adopted the detectives' narrative that she shot Tate in the face. She said that she was standing in the bedroom, beside her bed, and that he was standing in doorway to the hall, several feet away, and was looking at her when she shot him.

165. The detectives knew, or should have known, that Ackerman's confession was false because it contradicted the evidence known to them. They knew that Tate was shot in the temple, not the face, and that the bullet entered one temple and exited the other.

166. Indeed, Bedow later testified under oath in her deposition for Ackerman's criminal case that Ackerman's confession "still did not make sense to me where she explained she was

27

standing and he was standing in relation to what I had seen on scene and the picture I had seen of him lying on the ground."

## Tate Dies at the Hospital

167.  At 5:36 p.m. on December 11, 2020, the day after he shot himself, Tate was pronounced dead.

168.  Ackerman was never taken to the hospital to see Tate. She was not able to see him or say goodbye to him before he passed away.

## Neland Seeks an Arrest Warrant for Ackerman Based Only on Her Confession

169.  After Ackerman's false confession to murder, Neland applied for an arrest warrant for Ackerman. Neland's sole basis for the warrant was Ackerman's false confession to intentionally shooting Tate in the face.

170.  Neland concealed exculpatory information to mislead the magistrate judge into signing the arrest warrant. She concealed Ackerman's initial statements that Tate shot himself in the head. She concealed text messages that corroborated those statements. She concealed the CT report that the gunshot wound was self-inflicted. She omitted all details regarding the interrogation of Ackerman: Ackerman's unstable state, Ackerman's 24-hour hold in suicide watch, and Ackerman's lack of sleep and food.

171.  Without any exculpatory evidence and any context regarding Ackerman's alleged confession, the magistrate judge signed the arrest warrant based on Neland's false probable cause statement. Ackerman's bond was set at $1 million.

172.  Ackerman was charged with second-degree murder and armed criminal action.

## Neland and Bedow Ignore Evidence Supporting Ackerman's Initial Statement, and Fail to Investigate other Pieces of Evidence

173.    At 8:28 p.m. on December 11, Ackerman called her son, Blake, to tell him that she was being charged with second-degree murder. In the call, Ackerman stated that the detectives made her confess and that she did not remember anything. She said: "I can barely remember anything," "They put it in place," and "They made me."

174.    Bedow made a report based on this call. In her report, she selectively documented statements that, in isolation, appeared to corroborate Ackerman's false confession. Bedow intentionally omitted statements from Ackerman that her confession was false and coerced.

175.    On December 17, 2020, Neland and Bedow interviewed Ackerman's son, Blake, and her ex-husband, Kyle. Both stated that Ackerman barely knew how to use a gun.

176.    Blake and Kyle also stated that Ackerman was in love with Tate and that there was no way that she killed Tate. When Neland and Bedow asked what Blake and Kyle thought about Ackerman shooting Tate, they were emphatic that that was untrue:

> Kyle: It's impossible. No way. No one will ever get me to believe that. No way. There's no way that woman can load a gun, chamber a round, find a safety. No way. No way.
> Blake: By herself.
> Kyle: Huh-uh. Ain't gonna happen. She don't have it in her.
> Blake: Or not even point it at somebody. No.
> Kyle: No.

177.    On December 18, 2020, Neland requested forensic testing of the gun, the bullet that entered Tate's head, the shell casing found on the floor, and a swab of the shell casing.

178.    Neland did not request forensic testing of the gunshot residue swab taken from Tate's hands.

29

179.     The forensic testing of the gun showed that only Tate's DNA was on the trigger of the gun, contradicting Ackerman's false confession that she was the only—and last—person to use the gun.

### Neland, Bedow, and Ralston Fabricate Tate's Autopsy Report to Bolster Ackerman's False Confession

180.     On December 13, knowing they had no physical evidence that could bolster Ackerman's coerced, false confession, Neland and Bedow attended Shannon Tate's autopsy.

181.     Forensic Pathologist John Ralston, employed by Forensic Medical of Kansas City, conducted Tate's autopsy. Prior to working for Forensic Medical, Ralston had been a prominent pathologist in Illinois.

182.     During the autopsy, Ralston determined that Tate was shot on the right side of his head, confirming the results of the CT scan done at the hospital.

183.     Ralston then falsely concluded that Tate was shot at a "close range", meaning the gun was not in contact with Tate's head when it went off and was up to 36 inches from Tate's head.

184.     Upon information and belief, this false conclusion was at the direction of Neland and Bedow.

185.     Ralston knew or should have known that the gunshot wound was a "contact" wound, and the gun was firmly against Tate's head at the time it went off.

186.     As an experienced pathologist, Ralston knew Tate's wound was a contact wound.

187.     Ralston also falsely reported that the manner of Tate's death was "homicide."

188.     As an experienced pathologist, Ralston knew that the bullet wound was consistent with suicide but did not list that in his report. Upon information and belief, Ralston reached his conclusion based on Neland and Bedow's representation that Ackerman had confessed.

30

189.    Ralston shared his findings with Neland and Bedow during the autopsy and issued his report on April 13, 2021.

190.    Ralston's findings were demonstrably false to any experienced pathologist. After he died shortly before Ackerman's trial, the state appointed a different medical examiner, Diane Peterson, to review Tate's autopsy and testify at Ackerman's trial. Peterson concluded that the gunshot wound was a contact wound because both the muzzle imprint and soot were visible on the right side of Tate's head. Moreover, she stated these findings were consistent with suicide or homicide.

191.    Upon information and belief, Ralston falsified his findings at the request of Neland and Bedow to bolster Ackerman's false confession to a murder that did not occur.

192.    Upon information and belief, Ralston manipulated his autopsy report, in concert with Neland and Bedow, to be consistent with Ackerman's false confession and conclude that Tate had died by a close-range gunshot wound and that his death was a homicide.

### Forensic Medical and Frontier Forensics Pattern and Practice

193.    Forensic Medical Management Services acquired Frontier Forensics in 2017 to create a subsidiary called Forensic Medical of Kansas City. Forensic Medical of Kansas City continued to operate out of the same building as Frontier Forensics.

194.    Forensic Medical of Kansas and Frontier Forensics had a pattern of issuing autopsy reports that improperly concluded individuals had died by homicide.

195.    In January 2021, before Ralston issued his report, the Kansas Court of Appeals overturned a daycare employee's conviction based on evidence that a 2018 Forensic Medical autopsy report falsely concluded the employee had stomped on a baby's head, killing the child, when the evidence in fact proved that the child had died of natural causes.

31

196. In November 2020, before Tate's death, a Kansas City postman's conviction was overturned in part because Frontier Forensics falsely concluded in its autopsy report that a husband and wife had died in a "double homicide," supporting the police theory that a third individual had entered the husband and wife's home and killed them. In fact, the wife had shot the husband and then herself in a murder-suicide.

197. In 2015, during the retrial of a Kansas man accused of murder, Dr. Erik Mitchell, founder of Frontier Forensics, admitted on the stand that he based his opinion about the cause of death of the victim on police statements that the suspect lied about his whereabouts instead of the evidence from the autopsy. Indeed, the Kansas Supreme Court even highlighted Mitchell's deeply concerning admission in a 2018 order, writing: "The doctor conceded that, without the background information, the straight anatomical information revealed by the autopsy was suspicious, but not enough for the doctor to have made the decision that the death was caused by a homicidal strangulation." *State v. Miller*, 427 P.3d 907, 939 (Kan. 2018).

198. Upon information and belief, Frontier Forensics, which became Forensic Medical of Kansas City, improperly allowed and encouraged its employees to consider and rely upon law enforcement investigative theories and allowed law enforcement to influence autopsy reports.

199. Upon information and belief, Frontier Forensics, which became Forensic Medical of Kansas City, improperly allowed its employees' independence to be compromised by the police.

200. This is consistent with Ralston's actions in Ackerman's case: instead of truthfully determining that Tate had died from a contact gunshot wound, Ralston manipulated his autopsy report, in concert with Neland and Bedow, to be consistent with Ackerman's false confession and conclude that Tate had died by a close-range gunshot wound and that his death was a homicide.

32

201.    The above cases, which were widely publicized before and during the prosecution of Ackerman, put Clay County on notice that Forensic Medical had engaged in a pattern of violating citizen's constitutional rights by falsifying autopsies, and that future violations of citizens' constitutional rights would occur if the County did not intervene.

202.    Upon information and belief, the Clay County Prosecutor's Office had complained to the County about Ralston and Forensic Medical's unreliable autopsies.

203.    Upon information and belief, the County continued to hire Ralston and Forensic Medical to conduct autopsies despite this notice because Forensic Medical was cheaper than other options.

### Neland's False Statements Thwart Ackerman's Attempts to Lower her Bond

204.    After being charged with murder under a $1 million bond, Ackerman was jailed on December 11, 2020.

205.    Ackerman moved to reduce her bond four times. Her first attempt was December 18, 2020. The court held a hearing on that day, and, upon information and belief, Neland testified, relaying Ackerman's false confession.

206.    Based on Neland's testimony, the court denied the motion.

207.    Ackerman's second attempt to reduce her bond was on December 30, 2020.

208.    On January 6, 2021, the court held a hearing on Ackerman's motion.

209.    Neland was the sole witness for the state at the hearing. She testified she did not believe Ackerman's initial statement that Tate shot himself. She explained that Ackerman initially said that Tate had taken the gun down from somewhere and it fell and fired, shooting him in an accident.

33

210. Neland's testimony was not true. She knew Ackerman never said Tate was shot when he was getting the gun down from somewhere and it fell, accidentally firing.

211. There is nothing in the police report file or the police-worn body cameras, which recorded Ackerman from the moment police arrived at her house, to support Neland's false testimony.

212. After Neland's false testimony, the court denied Ackerman's motion to reduce bond and she was taken back to jail.

213. On March 23, 2021, Ackerman moved to reduce her bond a third time. The court held a hearing on April 6.

214. Upon information and belief, Woolery testified on behalf of the state.

215. The court again denied Ackerman's motion to reduce her bond.

### Ackerman is Finally Released on Bond

216. On February 17, 2022, Ackerman again moved the court to reduce her bond.

217. On February 22, 2022, the court agreed to lower her bond to $250,000, and Ackerman was released the same day.

218. Ackerman was incarcerated for one year, two months, and eleven days for a crime that never occurred.

219. Upon release, Ackerman was placed on restrictive house arrest until her trial.

### Ackerman's Incarceration

220. Ackerman's time behind bars was traumatic: she was locked away during the peak of the COVID-19 pandemic, living under daily fear of an uncontrolled viral outbreak.

221. For the first part of her detention, Ackerman was kept on suicide watch. Ackerman heard one man a few cells down from her scream day and night. To stop him, officers shut off his water supply.

34

222.    Another man in a cell next to Ackerman was in a wheelchair. Ackerman witnessed police take him out of his cell to question him. When the man did not give officers the answers they wanted, they screamed at the man, beat him until he fell out of his wheelchair, then tased him while he was on the ground.

223.    Ackerman witnessed others strapped into chairs with hoods covering their heads.

224.    Later, while outside of suicide watch, one of Ackerman's fellow detainees—whom she considered a friend—hung herself while she and Ackerman were both in jail. Her death only added to the trauma Ackerman experienced both from witnessing her fiancé's suicide and her wrongful incarceration.

225.    Throughout her wrongful incarceration, Ackerman missed crucial life events. She was not allowed to attend Tate's funeral, missed birthdays of loved ones, and was unable to take her ailing father to his cancer treatments. Ackerman's father died shortly after she was released from house arrest. She lost time with her father for nearly all of the final years of his life.

226.    For more than three years, Ackerman faced the terrifying reality of a murder trial for a crime that never occurred. Media attention—in which Ackerman was portrayed as a murderer—was widely seen in her community and fractured Ackerman's relationship with neighbors, friends, and family. She lost her job and her healthcare.

### Ackerman Acquitted at Trial

227.    Ackerman was tried for the murder of Shannon Tate from April 1 through April 8, 2024.

228.    The prosecution's only evidence was Ackerman's confession.

229.    On April 8, 2024, the jury returned a not guilty verdict.

## DAMAGES

230.    As a direct and foreseeable consequence of being arrested, wrongfully incarcerated, and tried for a crime she did not commit, Lori Ackerman suffered personal physical injury, physical sickness, emotional trauma, loss of consortium, and loss of liberty in each year from December 11, 2020, to April 8, 2024, as well as other damages to be determined at the trial of this matter.

## CAUSES OF ACTION

## FEDERAL CLAIMS

## COUNT I
## 42 U.S.C. § 1983

## VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS
### *Coerced Confession*

(Against Defendants Neland and Bedow in their individual capacities)

231.    Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

232.    Defendants Elizabeth Neland and Amber Bedow, acting in concert and aiding and abetting one another, deprived Ackerman of her right against compelled self-incrimination by intentionally and/or recklessly using coercive tactics to manipulate Ackerman's obvious mental health crisis and coerce her to falsely confess to murdering Shannon Tate.

233.    For more than 14 hours on December 11, 2020, Defendants Neland and Bedow engaged in the coercive techniques described in this complaint, including, but not limited to, those summarized below:

    a. Detaining Ackerman such that she was not free to leave, while advising Ackerman she was not under arrest;

b.  Preventing Ackerman from sleeping or eating overnight;

c.  Isolating Ackerman from her son, from Tate, and from support systems;

d.  Isolating Ackerman by taking her phone so she could not receive updates on Tate's condition;

e.  Manipulating Ackerman into believing information that the detectives knew was false, including, but not limited to, lying about the evidence they had available to them;

f.  Causing Ackerman to doubt her own memory by lying about basic details about the events of the evening and suggesting that she "blacked out" memories;

g.  Intimidating Ackerman by repeatedly insisting that she was lying, and making veiled threats that something bad would happen to her if she did not agree with their version of events;

h.  Making false promises to Ackerman that she would be able to see Tate in the hospital as soon as she gave them the information they needed;

i.  Feigning concern for Ackerman and pretending to be looking out for her best interests by promising her that they would support her "the whole way";

j.  Repeatedly feeding Ackerman false information that matched their narrative of events, even though the evidence contradicted that information;

k.  Holding Ackerman in a suicide watch cell for several hours in the middle of the interrogation to weaken her resolve; and

l.  Taking away Ackerman's clothes and forcing her to wear a hospital gown and then a "pickle suit."

234.    Ackerman was particularly vulnerable to Neland and Bedow's coercive tactics during the interrogation, and these Defendants were aware of her vulnerabilities:

   a.  Ackerman was in the midst of a mental health crisis, which the Neland and Bedow knew, evidenced by their initial plan to place her on a 96-hour mental health hold and her later placement on suicide watch;

   b.  Ackerman had been awake for 32 hours and had not eaten since lunch the day before; and

   c.  Ackerman had been drinking for several hours prior to the shooting and was interrogated only two hours after the shooting.

235.    In short, Defendants Neland and Bedow intentionally and deliberately used coercive tactics on Ackerman over a period of 14 hours to exploit Ackerman's mental health crisis and overcome her will to resist, causing her to make false, incriminating admissions.

236.    Neland and Bedow took these actions while deliberately ignoring the exculpatory evidence they possessed.

237.    Neland and Bedow's conduct was deliberate and in reckless disregard of Ackerman's constitutional rights.

238.    Neland and Bedow knew that their interrogation of Ackerman using these coercive techniques were likely to elicit incriminating admissions regardless of Ackerman's actual innocence.

239.    These false, coerced statements were used against Ackerman to her detriment throughout her criminal case. These statements were the sole basis of the warrant to arrest Ackerman and the Information filed against Ackerman.

38

240.    These same false statements were then used to persuade a judge to set her bond at $1 million and to persuade the court to repeatedly deny her motions to reduce bond.

241.    These false statements were also the sole basis of the prosecution's case against Ackerman at trial.

242.    Neland and Bedow's conduct in coercing Ackerman's false confession directly and proximately caused Ackerman's wrongful prosecution from December 11, 2020, until April 8, 2024. Neland and Bedow's conduct also directly and proximately caused Ackerman's wrongful detention from December 11, 2020, until February 22, 2022.

243.    Any reasonable law enforcement officer would have known—and Neland and Bedow did know—that the tactics used in obtaining Ackerman's confession were improper and violated her constitutional rights.

244.    No reasonable law enforcement officer would have engaged in the conduct set forth above or believed it to be lawful.

245.    Absent Neland and Bedow's misconduct, the arrest and prosecution of Ackerman could not and would not have been pursued.

246.    All of the foregoing acts and omissions were committed under color of state law and within the scope of Neland and Bedow's employment with the Smithville Police Department and Clay County Sheriff's Office, and violated clearly established law of which any reasonable officer would have known.

247.    All of the foregoing acts and omissions were committed deliberately, intentionally, in bad-faith, and/or with reckless disregard for the rights and safety of Lori Ackerman.

248. As a direct and proximate result of Neland and Bedow's deliberate, reckless, deliberately indifferent and/or bad-faith acts and omissions, Lori Ackerman was deprived of her constitutional right against self-incrimination, was wrongfully arrested, and suffered more than 14 months of wrongful incarceration and more than two years of wrongful house arrest.

249. As a direct and foreseeable consequence of being wrongfully incarcerated and wrongfully prosecuted, Lori Ackerman has suffered emotional trauma, loss of consortium, and loss of liberty in each year from 2020 to 2024, as well as other damages to be determined at the trial of this matter.

**COUNT II**
**42 U.S.C. § 1983**

**VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS**
***Unlawful seizure pursuant to criminal process based on false evidence***

(Against Neland and Bedow in their Individual Capacities)

250. Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

251. Defendants Neland and Bedow, acting in concert and aiding and abetting each other, unlawfully seized and instituted a criminal proceeding against Ackerman with charges of murder and armed criminal action despite her actual innocence and these Defendants' knowledge that no probable cause supported the institution of criminal charges against Ackerman.

252. Neland and Bedow, acting individually and in concert with each other, under color of state law and within the scope of their employment with the Smithville Police Department and the Clay County Sheriff's Office, caused, instituted, and participated in the unlawful seizure and initiation of a criminal proceeding against Ackerman despite the absence of probable cause.

Thereafter, these Defendants caused that criminal proceeding to be continued against Ackerman up to and through the time of trial.

253. Defendants Neland and Bedow caused Ackerman to be arrested and seized pursuant to an arrest warrant that was not supported by probable cause. Thereafter, these Defendants supplied false evidence to the Prosecutor's Office that directly resulted in Ackerman being charged with murder and armed criminal action.

254. The criminal proceedings described herein (Ackerman's arrest, charges, seizure, and trial) were instituted and continued by Defendants Neland and Bedow with malice. The wrongful actions of these Defendants caused false information to be provided to the Prosecutor's Office with knowledge that their actions would result in criminal proceedings being pursued against Ackerman.

255. Any preclusive effect that would ordinarily apply to a finding of probable cause by a magistrate judge is nullified by Neland and Bedow's deliberate and bad faith actions that led to false, incomplete, and misleading evidence being used to secure Ackerman's arrest, seizure, and charges.

256. Ackerman was seized on December 11, 2020, as a result of the initiation of the criminal proceedings, and she remained incarcerated pursuant to the wrongful criminal charges described herein up to and including February 22, 2022, when she was released on bond. Ackerman remained on house arrest pursuant to the wrongful criminal charges described herein from February 22, 2022 up to and including April 8, 2024, when the proceedings terminated in Ackerman's favor with her acquittal.

257. As a direct and foreseeable consequence of Neland and Bedow's misconduct described herein, Ackerman was unreasonably and unlawfully subjected to wrongful incarceration and criminal prosecution for more than 3 years.

258. Neland and Bedow's malicious prosecution and unlawful seizure of Ackerman caused her arrest, seizure, and prosecution for more than three years. As a direct and foreseeable consequence of Neland and Bedow's misconduct described in this count, Ackerman suffered physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

## COUNT III
## 42 U.S.C. § 1983

**VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FOURTEENTH AMENDMENT**
***Failure to Investigate***

(Against Neland, Bedow, and Woolery in their Individual Capacities)

259. Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

260. Throughout their investigation of Ackerman, Defendants Neland, Bedow, and Woolery, acting in concert with each other and aiding and abetting each other, deliberately, intentionally, and/or recklessly failed to follow basic and well-accepted investigative practices and take basic investigatory steps.

261. Neland, Bedow, and Woolery's failure to follow basic and well-accepted investigative practices deprived Ackerman of her clearly established right to due process of law and a fair criminal proceeding.

262. Neland, Bedow, and Woolery caused the arrest of Ackerman on December 11, 2020, and continued prosecution of Ackerman without taking the basic and well-accepted

investigative steps that any reasonable criminal investigator would have taken to determine whether a crime had occurred or whether Shannon Tate had simply shot himself, including but not limited to:

      a. Coercing and threatening Ackerman to falsely confess;

      b. Recklessly and/or willfully ignoring evidence corroborating Ackerman's innocence, including, but not limited to:

         i.    Refusing to test the gunshot residue swabs taken from Tate's hands;

        ii.    Refusing to swab Ackerman's hands, wrists, or forearms for gunshot residue;

      iii.    Refusing to ask Tate's nurses or doctors for the results of Tate's CT scan, even after being told that scans had been completed;

      iv.    Ignoring Ackerman's text messages with Tate that supported her statements that his mental health was poor on the day he shot himself;

      v.    Ignoring that the upward trajectory of the bullet in the wall was not indicative of the trajectory of the bullet before it entered Tate's skull;

      vi.    Ignoring the autopsy results that showed Tate was shot on the right side of his head, contradicting Ackerman's false and coerced confession;

      vii.    Ignoring DNA evidence on the gun proving that the only DNA on the trigger of the gun belonged to Tate;

      viii.    Ignoring Ackerman's statements to her son that Neland and Bedow had coerced her into making a false confession;

      ix.    Ignoring witness statements that supported Ackerman's innocence, including statements that she did not know how to use a gun; and

43

x.   Ignoring Ackerman's own repeated and consistent statements that Tate had shot himself; and

c. Creating systematic pressure to implicate Ackerman in the face of the above-listed contrary evidence, including:

i.   Coercing Ackerman to falsely confess;

ii.   Attempting to convince hospital staff to make statements that would be consistent with these Defendants' false narrative that Tate could not have shot himself;

iii.   Pressuring Tate's ICU nurse to not check the CT scans and to agree with these Defendants' false narrative that Tate could not have shot himself; and

iv.   Persuading forensic pathologist John Ralston to falsely state that Tate died of a close range gunshot wound and to list the manner of death as homicide rather than suicide.

263.   Neland, Bedow, and Woolery's failure to take the basic and well-accepted investigative steps of determining whether Tate had died by suicide and, therefore, no crime had occurred, was intentional, deliberate, and/or reckless.

264.   Neland, Bedow, and Woolery's intentional or reckless failure to investigate Tate's death, such that they did not even confirm that a crime had occurred, shocked the conscience.

265.   Neland, Bedow, and Woolery's failure to take the basic and well-accepted investigative steps in a homicide investigation violated Ackerman's right to a fair criminal proceeding under the due process clause of the Fourteenth Amendment to the Constitution of the United States.

44

266.     As a direct and foreseeable consequence of Neland, Bedow, and Woolery's misconduct described herein, Ackerman was unreasonably and unlawfully subjected to criminal prosecution and wrongful incarceration over a period of 3 years.

267.     Neland, Bedow, and Woolery's failure to investigate Tate's death caused Ackerman's arrest, seizure, and prosecution for more than three years. As a direct and foreseeable consequence of the Defendants' misconduct described in this count, Ackerman suffered physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

**COUNT IV**
**42 U.S.C. § 1983**

**VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS**
***Fabrication of Evidence***

(Against Neland, Bedow, and Ralston in their Individual Capacities)

268.     Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

269.     The performance of an autopsy is an official state duty, therefore Ralston acted under color of state law when he conducted Tate's autopsy.

270.     Defendants Neland, Bedow, and Ralston, acting individually and in concert with each other, under color of state law and within the scope of their employment with the City of Smithville, Clay County, and Forensic Medical continued a criminal proceeding against Ackerman based on fabricated evidence—namely, the autopsy report that falsely stated Tate died of a close range gunshot wound and that his death was a homicide.

271.     Ackerman's seizure and trial were continued by Defendants Neland, Bedow, and Ralston with malice. The wrongful actions of these Defendants caused false information to be

45

provided to the Prosecutor's Office with knowledge that their actions would result in criminal proceedings being pursued against Ackerman.

272.    Ackerman remained incarcerated pursuant to the wrongful criminal charges described herein up to and including February 22, 2022, when she was released on bond. Ackerman remained on house arrest pursuant to the wrongful criminal charges described herein from February 22, 2022 up to and including April 8, 2024, when the proceedings terminated in Ackerman's favor with her acquittal.

273.    As a direct and foreseeable consequence of Neland, Bedow, and Ralston's misconduct described herein, Ackerman was unreasonably and unlawfully deprived of her liberty by being subjected to criminal prosecution and wrongful incarceration for a period of more than 3 years.

274.    Neland, Bedow, and Ralston's fabrication of evidence caused Ackerman's seizure and prosecution to continue for more than three years. As a direct and foreseeable consequence of the Defendants' misconduct described in this count, Ackerman suffered physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

## COUNT V
## 42 U.S.C. § 1983

### VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS
### *Civil Conspiracy*

(Against Neland, Bedow, Woolery, and Ralston)

275.    Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

46

276. During the investigation into Shannon Tate's death, Neland, Bedow, Woolery, and Ralston knowingly conspired, reached a mutual understanding, and acted in concert to violate Ackerman's constitutional rights, including her Fourth Amendment right to not be seized based on false or fabricated evidence, her Fifth Amendment right to not incriminate herself, and her Fourteenth Amendment right to due process. They agreed amongst themselves to fabricate and use false inculpatory evidence against Ackerman and to fail to investigate Tate's death, despite Ackerman's actual innocence and their knowledge of that innocence.

277. In furtherance of the conspiracy, Neland, Bedow, Woolery, and Ralston undertook overt acts, including without limitation:

    a. Neland and Bedow, acting individually and/or in concert with each other, coerced Ackerman into falsely confessing to shooting Tate;

    b. Neland and Bedow, acting individually and/or in concert with each other, sought an arrest warrant against Ackerman based on only her false confession, which they knew was false;

    c. Neland, Bedow, and Woolery, acting individually and/or in concert with each other, failed to investigate Tate's death, including but not limited to the acts summarized in ¶ 262 above;

    d. Neland, Bedow, and Ralston, acting individually and/or in concert with each other, fabricated the results of Tate's autopsy to say he died by a close range gunshot, a homicide, to match the police theory of the case; and

    e. Neland, Bedow, Woolery, and Ralston engaged in additional overt acts in furtherance of their conspiracy, the full extent of which will be developed through discovery and proven at trial.

278. The conspiracy among Neland, Bedow, Woolery, and Ralston directly and proximately deprived Ackerman of her rights under the Fourth, Fifth, and Fourteenth Amendments, resulting in her unjust prosecution and over three years of unlawful pretrial detention. As a direct and foreseeable result of their conspiracy, Ackerman suffered physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

**COUNT VI**
**42 U.S.C. § 1983**

**MUNICIPAL LIABILITY CLAIM**
***Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)**

(Against Clay County)

279. Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

280. At all times relevant to this Complaint, Clay County hired Forensic Medical of Kansas City and John Ralston to conduct autopsies on the County's behalf.

281. Upon information and belief, the Clay County Commission made the decision to hire and continue hiring Forensic Medical.

282. The Clay County Commission is a municipal body with decision-making authority. The actions of the Clay County Commission constitute an official policy of Clay County.

283. Clay County, through the Clay County Commission, had a policy of hiring Forensic Medical to conduct autopsies on behalf of the County.

284. Clay County had notice of Forensic Medical's pattern of creating false autopsy reports, violating citizens' constitutional rights, before Ralston falsified Shannon Tate's autopsy report:

48

a.  Through the widely publicized cases listed in ¶¶ 195-197 where Frontier Forensics and Forensic Medical of Kansas City falsified autopsies to corroborate false police theories; and

b.  Through complaints by prosecutors who informed the commission that Forensic Medical was not reliable.

285.    Ralston, Neland, and Bedow's wrongful acts fabricating Tate's autopsy report was carried out pursuant to Clay County's unconstitutional policy of hiring Forensic Medical, which was known to falsify autopsy reports to corroborate false police theories.

286.    Ralston, Neland, and Bedow's fabrication of Tate's autopsy report caused the continuation of Ackerman's pretrial detention and wrongful prosecution.

287.    Clay County condoned the use of Forensic Medical despite having actual knowledge that Forensic Medical routinely violated individual's rights and took actions that caused wrongful prosecutions.

288.    As a moving force and direct and foreseeable consequence of Clay County's policy of hiring Forensic Medical, Ackerman was wrongfully prosecuted and taken to trial, and she suffered physical, emotional, psychological, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

## STATE CLAIMS

## COUNT VII

### FALSE ARREST

(Against Neland and Bedow)

289.    Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

49

290.     Ackerman was confined against her will when she was held in pretrial detention based on Neland and Bedow's false statements in their application for a warrant.

291.     There was no legal justification to hold Ackerman in pretrial detention because the only evidence supporting her arrest was her false, coerced confession, which Neland and Bedow knew was false.

292.     Neland and Bedow maliciously and in bad faith used Ackerman's false confession to secure Ackerman's arrest.

## COUNT VIII

## MALICIOUS PROSECUTION

(Against Neland, Bedow, Ralston, and Forensic Medical of Kansas City)

293.     Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

294.     Neland and Bedow commenced Ackerman's prosecution with the warrant for Ackerman's arrest.

295.     The commencement of Ackerman's prosecution was based entirely on her false confession, which was coerced by Neland and Bedow.

296.     Neland and Bedow knew Ackerman's confession was false.

297.     Neland, Bedow, and Ralston caused Ackerman's prosecution to be continued by intentionally falsifying the autopsy report to state that Tate was shot at a "close range" and that his death was a homicide, thus bolstering Ackerman's false confession.

298.     The prosecution of Ackerman terminated in Ackerman's favor when she was acquitted of all charges on April 8, 2024.

299.    Without Ackerman's false confession or the falsified autopsy report, there was no probable cause to arrest or prosecute Ackerman.

300.    Neland and Bedow acted with malice and in bad faith when they sought a warrant for Ackerman's arrest based on false evidence.

301.    Neland, Bedow, and Ralston acted with malice and in bad faith when they falsified Tate's autopsy report to say that Tate was shot at a "close range" and that his death was a homicide.

302.    Ackerman was damaged by being held in pretrial detention for more than one year and two months, by being placed on house arrest for two years, by being wrongfully prosecuted for over three years, by being wrongfully threatened with murder charges and tried for murder, and by other damages flowing from the aforementioned actions and to be proved at trial.

303.    At all times relevant to the complaint, Ralston was employed by Forensic Medical of Kansas City.

304.    When Ralston conducted the autopsy of Shannon Tate, he was acting within the scope of his employment with Forensic Medical.

305.    Ralston engaged in intentional misconduct when he falsified Tate's autopsy report to say that Tate was shot at a "close range" and that his death was a homicide.

306.    This misconduct was consistent with Forensic Medical of Kansas City's history of falsifying autopsy reports to comport with police officers' false theories. Upon information and belief, Forensic Medical of Kansas City willfully, wantonly, and maliciously encouraged its employees to engage in such misconduct.

307.    Under the theory of *respondeat superior*, Forensic Medical of Kansas City is liable for damages attributable to Ralston's misconduct in falsifying the autopsy report.

## PUNITIVE DAMAGES

(Against Defendants Neland, Bedow, Woolery, Ralston, and Forensic Medical of Kansas City)

308.     Lori Ackerman incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

309.     The acts and omissions of all Defendants as alleged above were willful and wanton as a matter of law and evidenced a reckless disregard for and indifference to the rights and safety of the public, including Lori Ackerman, who as a result spent more than three years defending herself against wrongful charges.

310.     The willful and wanton acts alleged above proximately caused the injuries suffered by Lori Ackerman. Ackerman is therefore entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lori Ackerman respectfully requests that the Court enter judgment in her favor against all Defendants on all counts of the Complaint, and award relief as follows:

311.     Compensatory damages against Defendants in an amount to be determined at trial;

312.     Punitive damages against Defendants in an amount to be determined at trial, to deter similar conduct by Defendants and other law enforcement officers;

313.     Pre-judgment and post-judgment interest and recovery of her costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1920, against Defendants; and

314.     Any and all other relief to which she may be entitled.

This 5th day of December, 2025.

/s/ Eric Vernon
Eric Vernon

52

Baldwin and Vernon, LLC
Missouri Bar No. 47007
108 S Pleasant St
Independence, MO 64050
Telephone: (816) 842-1102
eric@bvalaw.net

David S. Rudolf, Esq., NCBN: 8587
Sonya Pfeiffer, Esq., NCBN: 37300
Elizabeth Barbery Ames, Esq., NCBN: 63121
**PFEIFFER RUDOLF**
2137 South Boulevard, Suite 300
Charlotte, NC 28203
Telephone: (704) 333-9945
Fax: (704) 335-0224
dsr@pr-lawfirm.com
spf@pr-lawfirm.com
eba@pr-lawfirm.com
*Attorneys for Plaintiff*