**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | | |
|---|---|---|
| LORI ACKERMAN,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH NELAND; AMBER BEDOW; TRENTON WOOLERY; ELIZABETH RALSTON, AS THE ADMINISTRATOR OF THE ESTATE OF JOHN RALSTON; CLAY COUNTY, MISSOURI; FORENSIC MEDICAL OF KANSAS, LLC,<br><br>Defendants. | ) | Case No. 4:25-cv-00948-RK |

**ORDER**

Plaintiff Lori Ackerman brings this lawsuit asserting claims under 42 U.S.C. § 1983 and Missouri law following her acquittal of the murder of her fiancé. The defendants are as follows: (1) Clay County, Missouri; (2) Detective Elizabeth Neland, Detective Amber Bedow, and Officer Trenton Woolery of the Smithville Police Department; and (3) forensic pathologist, Dr. John Ralston,[1] and his employer, Forensic Medical of Kansas, LLC. Currently before the Court are several motions: (1) Officer Woolery's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. 27); (2) Dr. Ralston and Forensic Medical of Kansas, LLC's motion to dismiss pursuant to Rule 12(b)(6), (Doc. 32); (3) Detective Neland's motion for partial judgment on the pleadings pursuant to Rule 12(c), (Doc. 37); and (4) Detective Neland's motion for leave to file supplemental briefing on her motion for partial judgment on the pleadings, (Doc. 56). The motions are fully briefed, with the exception of Detective Neland's motion for leave to file supplemental briefing—she did not file a reply and the time for doing so has expired.

After careful consideration and for the reasons stated below, the Court **ORDERS** that: (1) Officer Woolery's motion to dismiss is **GRANTED**; (2) Dr. Ralston and Forensic Medical of Kansas, LLC's motion to dismiss is **DENIED**; (3) Detective Neland's motion for partial judgment

[1] Dr. Ralston died on November 20, 2022. Plaintiff names Elizabeth Ralston, the Administrator of Dr. Ralston's estate, as the responsible party in this lawsuit.

on the pleadings is **GRANTED**; and (4) Detective Neland's motion for leave to file supplemental briefing is **DENIED as moot**.

## Background[2]

On December 10, 2020, Plaintiff's fiancé, Shannon Tate, began drinking around lunchtime. Distressed by personal and work matters, Tate texted Plaintiff from the bar: "[E]verything is starting to get to me . . . I will get/through or past it or [it] will be the death of me." (Doc. 1 at ¶ 38.) The week prior, Tate had "spiraled" over the issues and attempted to leave their shared residence with his gun; however, Plaintiff stopped him.

Plaintiff eventually joined Tate at the bar. After they returned home, Tate "prodded [Plaintiff] to prove the stability of their relationship while lamenting the other stressors in his life." (*Id.* at ¶ 40.) Exhausted with this pattern, Plaintiff retreated to their bedroom, retrieved Tate's handgun, and placed it under her chin. Tate took the gun from Plaintiff and Plaintiff left the bedroom and began walking down the hall. As Plaintiff walked away, she heard Tate shoot himself in the head.

Plaintiff called 911 and first responders arrived three minutes later. Paramedics took Tate to the hospital by ambulance. Officer Woolery spoke to Plaintiff. Plaintiff, distraught, collapsed and sobbed on the floor. Plaintiff recounted the happenings of the evening at least ten times to Officer Woolery—she and Tate returned home after spending hours at a bar, they argued, and Tate shot himself. At one point, Officer Woolery watched Plaintiff bruise her wrists by repeatedly hitting her garage door.

Eventually, Detective Neland arrived at the scene and spoke to the officers already present. Sergeant James Morgan[3] "falsely told the other law enforcement officers on scene that Tate had a bullet wound in the middle of his forehead"[4]—medical records and an autopsy would later determine that the bullet entered Tate's right temple. (Doc. 1 at ¶ 60.) Officers examined the scene. The bullet went through Tate's head and through a wall in the hallway. There was no other damage to the house. Officers "suspected that the bullet appeared to have an upward trajectory in

---

[2] The following facts are drawn from Plaintiff's Complaint, (Doc. 1), unless otherwise noted and are accepted as true for purposes of the pending motions to dismiss and motion for judgment on the pleadings.

[3] Sergeant Morgan is not a named defendant.

[4] Although not entirely clear from the Complaint, Sergeant Morgan was presumably the only officer, or one of the only officers, to see Tate before he was taken to the hospital.

the wall of the hallway," leading to their opinion that Tate was shot by someone shorter than him. (*Id.* at ¶ 61.) The Court infers that Plaintiff was shorter than Tate.

Officer Woolery told Detective Neland that Plaintiff was "hysterical," and that he found Plaintiff's behavior suspicious because she became more emotional when he asked her what happened. (Doc. 1 at ¶¶ 52, 54, 62.) Officer Woolery also relayed his concern that Plaintiff broke her wrists. Initially, Detective Neland and Officer Woolery planned to place Plaintiff on an involuntary medical hold due to her mental and physical state. Instead, they decided Plaintiff would go to the station for interrogation.

When Tate arrived at the hospital, medical staff performed a CT scan, which revealed a bullet wound to Tate's right temple and an exit wound on the left side of his head. The radiologist report determined Tate suffered a "self[-]inflicted gun shot to right side of head." (*Id.* at ¶ 69.) The CT scan and radiology report were entered into Tate's medical record at 11:31 p.m. Tate's doctor told Tate's daughter and Plaintiff's son, who were at the hospital, that Tate suffered a self-inflicted gunshot wound which he would likely succumb to.[5]

Officer Woolery arrived at the hospital around 12:30 a.m. He swabbed Tate's hands for gunshot residue.[6] Officer Woolery told medical staff that Plaintiff was hysterical and she murdered Tate, and that the crime scene was suspicious. Officer Woolery told unspecified medical staff that Tate suffered a gunshot wound to the middle of his forehead, but a nurse advised him that there was no wound on the middle of Tate's forehead. Officer Woolery asked nurses questions, including about their knowledge of the entrance and exit wound, and the nurses told Officer Woolery that they could only speculate because bandages were covering Tate's head. Officer Woolery also asked Tate's ICU charge nurse about her knowledge of the entrance wound, who replied that she would need to check the CT scan report. Officer Woolery then falsely told the ICU charge nurse "that the ER nurses were certain the entrance wound was on the left side of Tate's head." (*Id.* at ¶ 81.) Officer Wooley never asked to see the CT scan report, what the results were, or if he could speak with Tate's doctor. Officer Woolery called the station and "falsely advised the station that

[5] Plaintiff alleges both that the doctor told Tate's daughter and Plaintiff's son that Tate had died from the wound sometime around midnight, but also that Tate was not pronounced dead until the next day, December 11, 2020, at 5:36 p.m. (Doc. 1 at ¶¶ 71, 77, 167.) Tate's autopsy report, attached to Dr. Ralston and Forensic Medical of Kansas, LLC's motion to dismiss, indicates that Tate died on December 11 at 5:36 p.m. (Doc. 33-3.)

[6] Although not attributable to Officer Woolery, the swabs were never tested.

the bullet entered the left side of Tate's skull and exited the right." (*Id.* at ¶ 79.) Tate was right-handed. This information was used during Plaintiff's interrogation.

Detective Neland and Bedow's interrogation of Plaintiff began at 12:19 a.m. and lasted fourteen hours. Plaintiff alleges that the detectives coerced her into falsely confessing that she shot Tate in the face—a confession which contradicted evidence known to them (i.e., that the bullet entered one temple and exited the other).

Detective Neland obtained an arrest warrant based solely on Plaintiff's confession that she intentionally shot Tate in the face. On or about December 11, 2020, Plaintiff was charged with second-degree murder and armed criminal action. Her bond was set at $1 million.

The investigation continued. On December 13, 2020, Detectives Neland and Bedow attended Tate's autopsy, which was conducted by Dr. Ralston. Dr. Ralston determined that Tate was shot on the right side of his head. He also concluded that Tate was shot at "close range," meaning the gun was within "36 inches from Tate's head" but "was not in contact with Tate's head when it went off." (*Id.* at ¶ 183.) Plaintiff alleges that this "false conclusion was at the direction of" Detectives Neland and Bedow and that Dr. Ralston knew that Tate instead suffered a contact wound, meaning the gun was firmly against Tate's head when it was fired. (*Id.* at ¶ 183, 185-86.) Dr. Ralston also falsely concluded that Tate's manner of death was a homicide based upon Detective Neland and Bedow's representation that Plaintiff had confessed. The autopsy report was issued on April 13, 2021.

On December 17, 2020, Detectives Neland and Bedow interviewed Plaintiff's son and ex-husband, who both emphatically insisted that Plaintiff could not and would not shoot Tate and emphasized that Plaintiff did not know how to use a gun. On December 18, Detective Neland requested forensic testing of the gun, bullet, and shell casing; she did not request testing of the gunshot residue swab taken from Tate's hands. The testing showed only Tate's DNA on the trigger.

Plaintiff remained incarcerated from December 11, 2020, until February 22, 2022, when a court lowered her bond to $250,000. After Plaintiff was released on bond, she was placed on restrictive house arrest until her trial.

Dr. Ralston died on November 20, 2022. Accordingly, the State contracted with a different medical examiner, Dr. Diane Peterson, to review Tate's autopsy and testify at Plaintiff's trial. In contrast to Dr. Ralston's autopsy report, Dr. Peterson concluded that Tate's wound "was a contact

wound because both the muzzle imprint and soot were visible on the right side of Tate's head"; moreover, that the findings were consistent with suicide or homicide. (*Id.* at ¶ 190.)

Plaintiff was tried for Tate's murder in a jury trial from April 1 through 8, 2024. The jury returned a not guilty verdict.

Plaintiff asserts eight claims as follows:

| Count | Claim | Defendants |
| --- | --- | --- |
| Count 1 | § 1983 (Fifth and Fourteenth Amendment[7] Coerced Confession claims) | Detectives Neland and Bedow |
| Count 2 | § 1983 (Fourth and Fourteenth Amendment Unlawful Seizure claims) | Detectives Neland and Bedow |
| Count 3 | § 1983 (Fourteenth Amendment Failure to Investigate claims) | Detectives Neland and Bedow and Officer Woolery |
| Count 4 | § 1983 (Fourth and Fourteenth Amendment Fabricated Evidence claims) | Detectives Neland and Bedow and Dr. Ralston |
| Count 5 | § 1983 (Fourth, Fifth and Fourteenth Amendment Civil Conspiracy claims) | Detectives Neland and Bedow, Officer Woolery, and Dr. Ralston |
| Count 6 | § 1983 (Municipal liability claim) | Clay County |
| Count 7 | State Law False Arrest | Detectives Neland and Bedow |
| Count 8 | State Law Malicious Prosecution | Detectives Neland and Bedow, Dr. Ralston, Forensic Medical of Kansas, LLC |

**Legal Standard**

Motions to dismiss under Rule 12(b)(6) and motions for judgment on the pleadings under Rule 12(c) are subject to the same standard of review. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990); *see also Spagna v. Phi Kappa Psi, Inc.*, 30 F.4th 710, 715 (8th Cir. 2022). The federal pleading rules provide that a pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a

[7] The constitutional origin of each of these claims is derived from the Complaint. The Court expresses no opinion as to whether the claims as captioned are cognizable.

defendant may challenge a pleading's legal sufficiency in a motion to dismiss. To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wilson v. Ark. Dep't. of Hum. Servs.*, 850 F.3d 368, 371 (8th Cir. 2017) (internal quotation marks omitted). While a complaint does not need to include detailed factual allegations, the complaint must allege "more than a sheer possibility that a defendant acted unlawfully" to survive a motion to dismiss. *Wilson*, 850 F.3d at 371. When considering a motion to dismiss for failure to state a claim, the well-pleaded allegations in the complaint must be accepted as true and construed in the light most favorable to the non-moving party. *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996). However, the Court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002).

**Discussion**

Pending before the Court are the following motions: (1) Officer Woolery's motion to dismiss pursuant to Rule 12(b)(6), (Doc. 27); (2) Dr. Ralston and Forensic Medical of Kansas, LLC's motion to dismiss pursuant to Rule 12(b)(6), (Doc. 32); (3) Detective Neland's motion for partial judgment on the pleadings pursuant to Rule 12(c), (Doc. 37); and (4) Detective Neland's motion for leave to file supplemental briefing on her motion for partial judgment on the pleadings, (Doc. 56). The Court addresses each motion in turn.

**I. Officer Woolery's Motion to Dismiss, (Doc. 27)**

Officer Woolery seeks dismissal of both counts alleged against him—Count 3 (§ 1983 failure to investigate) and Count 5 (§ 1983 civil conspiracy).

**A. Count 3 – § 1983 Failure to Investigate**

In Count 3, Plaintiff asserts a substantive due process claim pursuant to § 1983, arguing that Officer Woolery conducted a constitutionally deficient investigation when he (1) recklessly or willfully ignored evidence suggesting Plaintiff's innocence, and (2) systematically pressured other officers and nurses to implicate Plaintiff in the face of evidence suggesting otherwise. Officer Woolery argues that he is entitled to qualified immunity.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State . . . shall . . . deprive any person of life, liberty, or property, without due process of law." Plaintiff alleges that her substantive due process claim against Officer Woolery is derived from her liberty interest in fair criminal proceedings. *See Winslow v. Smith*, 696 F.3d 716, 731 (8th Cir. 2012); *Stockley v. Joyce*, 963 F.3d 809, 821 (8th Cir. 2020) (recognizing substantive due process claim for reckless investigation after criminal defendant was acquitted); *Walz v. Randall*, 2 F.4th 1091, 1104 (8th Cir. 2021) (recognizing substantive due process claim for reckless investigation after charges were dismissed by prosecutor in face of *Miranda* rights violation).

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Nash v. Folsom*, 92 F.4th 746, 754 (8th Cir. 2024). A defendant "seeking dismissal under Rule 12(b)(6) based on an assertion of qualified immunity 'must show that [he is] entitled to qualified immunity on the face of the complaint.'" *Murphy v. Schmitt*, 143 F.4th 914, 918 (8th Cir. 2025) (quoting *Carter v. Huterson*, 831 F.3d 1104, 1107 (8th Cir. 2016)). "A government official is entitled to qualified immunity unless (1) the facts alleged by the plaintiff establish the violation of a constitutional right; and (2) the right was clearly established at the time of the official's alleged misconduct." *Id.* (citing *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015)).

"To establish a constitutional violation based on an inadequate investigation, a plaintiff must show that the defendant officer's failure to investigate was intentional or reckless, thereby shocking the conscience." *Torgerson v. Roberts Cnty. of S. Dakota*, 139 F.4th 638, 645 (8th Cir. 2025) (quoting *Winslow*, 696 F.3d at 732). "Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to the conscience-shocking level." *Id.* (quoting *Davis v. White*, 794 F.3d 1008, 1015 (8th Cir. 2015)). The inquiry is context specific; however, the Eighth Circuit has

> held that the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence.

*Walz*, 2 F.4th at 1104 (quoting *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009)). A reckless-investigation claim requires more than negligence or even gross negligence to establish a due process violation, however. *Hawkins v. Gage Cnty., Neb.*, 759 F.3d 951, 956-57 (8th Cir. 2014).

First, the Court considers Plaintiff's contention that Officer Woolery's failure to investigate shocked the conscience because he recklessly or willfully ignored evidence suggesting Plaintiff's innocence—i.e., her repeated statements that Tate shot himself and the CT scan report.

Initially, the Court notes that according to the Complaint, Officer Woolery did not ignore Plaintiff's claims that Tate shot himself; rather, he shared Plaintiff's statements with other officers and Detective Neland, and they began an investigation. The crux of Plaintiff's failure to investigate claim against Officer Woolery relates to his failure to obtain the CT scan report. While Officer Woolery disputes that Plaintiff has established that he was aware of the CT scan report, the Court must assume the truth of this factual assertions at this stage; i.e., Officer Woolery was aware that a CT scan was performed; a report of that scan was available, had Officer Woolery requested it from medical staff; the report would have shown that the bullet entered the right side of Tate's head and exited on the left side; and the radiologist report determined that Tate suffered a "self-inflicted gun shot to the right side of head." (Doc. 1 at ¶¶ 68-70, 76-78, 80.) However, Officer Woolery did not obtain the CT scan report. Instead, Officer Woolery "falsely advised the station that the bullet entered the left side of Tate's skull and exited the right." (*Id.* at ¶ 79.)

However, even accepting the truth of the factual allegations set forth in the Complaint, Officer Woolery's failure to obtain the CT scan report does not rise to the level of a constitutional violation under Eighth Circuit precedent. With little explanation, Plaintiff asserts that the CT scan report was evidence which suggested Plaintiff's innocence. The CT scan report established that Tate was shot in his right temple, and Plaintiff infers that because Tate was right-handed, the CT scan report suggests that Tate, rather than Plaintiff, fired the gun into Tate's right temple. However, the fact that Tate was shot in his right temple is not mutually inconsistent with Plaintiff being the shooter—either Tate or Plaintiff (or someone else, if present) could have pulled the trigger. (*See* Doc. 1 at ¶ 190 (Dr. Peterson concluded that the autopsy findings were consistent with suicide or homicide.).) This possibility is borne out by the continued prosecution of Plaintiff for Tate's murder even after an autopsy confirmed that the bullet entered his right temple. The Court concludes that the CT scan report, without more, did not suggest Plaintiff's innocence, and therefore even assuming that Officer Woolery purposefully ignored this evidence, the facts alleged do not rise to conscious-shocking behavior for purposes of a reckless investigation claim. *See* *Walz*, 2 F.4th at 1104 ("evidence that investigators purposefully ignored evidence suggesting the defendant's innocence" shocks the conscience).

Second, Plaintiff alleges that Officer Woolery's failure to investigate rose to conscious-shocking behavior because he created systematic pressure to implicate Plaintiff in the face of contrary evidence of her innocence by (1) telling other law enforcement officers at the scene that Plaintiff's behavior was suspicious because she was emotional, and (2) "[a]ttempting to convince hospital staff to make statements that would be consistent with [Officer Woolery and Detective Neland and Bedow's] false narrative that Tate could not have shot himself" and "[p]ressuring Tate's ICU nurse to not check the CT scans and to agree with [Officer Woolery and Detective Neland and Bedow's] false narrative that Tate could not have shot himself." (Doc. 1 at ¶¶ 54, 262(c)(ii)-(iii).) These allegations fall short of shocking the conscience, as well.

Plaintiff attempts to cast statements made to highly trained professionals as creating systematic pressure to implicate Plaintiff. *Cf. Winslow*, 696 F.3d at 732, 735 (finding officers exerted undue pressure on "vulnerable witnesses," including by "engag[ing] in weeks of indoctrination . . . to provide testimony that was not within those witnesses' personal memory"). An officer's statement to other arriving officers on the scene of a fatal shooting regarding the arriving officer's subjective, initial impression of the only other person present when the shooting occurred surely does not create the systematic pressure contemplated by Eighth Circuit precedent. Moreover, Officer Woolery's minimal interactions with nurses on the night of the shooting, coupled with the nurses' apparent lack of authority over the medical evidence or investigation, clearly do not rise to the level of systematic pressure to implicate Plaintiff in the face of contrary evidence. Therefore, the Court concludes that Officer Woolery's statement to other officers and nurses on the night of the shooting did not rise to conscious-shocking behavior.

Additionally, Plaintiff's failure to investigate claim against Officer Woolery faces another problem, which is that "§ 1983 demands more than a simple claim that the appellees engaged in wrongful conduct and the appellants were deprived of constitutional rights. . . . [A] plaintiff must plead facts that would tend to establish that the defendant's wrongful conduct[] *caused* the constitutional deprivation." *Zutz v. Nelson*, 601 F.3d 842, 851 (8th Cir. 2010) (citing *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986)); *see also Martinez v. California,* 444 U.S. 277, 285 (1980) ("not every injury in which a state official has played some part is actionable" under § 1983).

The Court looks to state common law to analyze causation issues under § 1983. *Hackenmueller v. Fadden*, 196 F. Supp. 3d 992, 999 (D. Minn. 2016). In Missouri, that requires

"but-for" and proximate causation. *Aaron v. Nat'l R.R. Passenger Corp.*, 163 F.4th 503, 511 (8th Cir. 2025) (citing *Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 562 (Mo. banc 2014)). "But-for causation is causation in fact; it requires the plaintiff to prove their injury would not have occurred but for the defendant's conduct." *Id.* (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860-61 (Mo. 1993)).

It is undisputed that Officer Woolery did not participate in Plaintiff's interrogation; rather, Plaintiff alleges that Officer Woolery provided false information (i.e., that the bullet entered the left side of Tate's head) to Detectives Neland and Bedow which the detectives then "used against" Plaintiff during her interrogation. As to causation, Plaintiff argues that Officer Woolery ignored evidence which "would inform . . . the trajectory of the investigation by failing to request or review records from Tate's CT scan." (Doc. 34 at 13.) In the most favorable reading of the Complaint, Plaintiff asserts that Officer Woolery's failure to obtain and pass along Tate's CT scan report *while* Detectives Neland and Bedow interrogated Plaintiff is what prompted the detectives to coerce Plaintiff into falsely confessing. Plaintiff's theory of culpability as to Officer Woolery's failure to obtain the CT scan report is simply too attenuated to support a § 1983 claim. *See Hackenmueller*, 196 F. Supp. 3d at 1000 (rejecting § 1983 plaintiff's claim that an officer's "'false' report caused him constitutional harm because it set the wheels in motion for him to be charged"—the prosecutor's independent charging decision broke the chain of causation).

Causation poses an even more insurmountable hurdle for Plaintiff's claim that Officer Woolery created systematic pressure to implicate Plaintiff by attempting to convince and pressuring hospital staff to agree with the false narrative that Tate could not have shot himself. First, Plaintiff does not plead that nurses or hospital staff did in fact agree or make statements in line with the false narrative. Rather, Plaintiff's allegations make clear that a nurse corrected Officer Woolery's claim that Tate had a gunshot wound in the middle of his forehead and other nurses told Officer Woolery that they did not know the location of the wound due to the bandages. Even so, Plaintiff does not plead any causal connection between the statements or opinions of nurses as to Tate's manner of death and the investigation. Therefore, even if Officer Woolery's statements to nurses were conscious-shocking, Plaintiff has not alleged facts that tend to establish that his conduct caused a constitutional deprivation.

For these reasons, Count 3 as alleged against Officer Woolery is **DISMISSED**.

### B. Count 5 – § 1983 Conspiracy

In Count 5, Plaintiff alleges that Officer Woolery conspired with Detectives Neland and Bedow and Dr. Ralston to fail to investigate Tate's death. Officer Woolery argues that the allegations are insufficient to establish an agreement to deprive Plaintiff of her constitutional rights.

To state a § 1983 conspiracy claim, a plaintiff must allege: "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *Faulk v. City of St. Louis*, 30 F.4th 739, 747 (8th Cir. 2022) (internal quotation marks omitted). "[A] conspiracy claim requires allegations of specific facts showing a 'meeting of the minds' among the alleged conspirators." *Wolk v. City of Brooklyn Ctr.*, 107 F.4th 854, 860 (8th Cir. 2024) (quoting *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010)). While the complaint "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement," this burden can be satisfied by "pointing to at least some facts which would suggest the defendants 'reached an understanding' to violate [the plaintiff's] rights." *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016) (quotation modified) (quoting *City of Omaha Emps. Betterment Ass'n v. City of Omaha,* 883 F.2d 650, 652 (8th Cir. 1989)).

With respect to her conspiracy claim against Officer Woolery, Plaintiff's only allegation supporting the first element is that Officer Woolery, Detectives Neland and Bedow, and Dr. Ralston "agreed amongst themselves to . . . fail to investigate Tate's death." (Doc. 1 at ¶ 276.) That conclusory allegation clearly falls short of the pleading requirement for § 1983 civil conspiracy claims. *See Wolk*, 107 F.4th at 860 (holding that "conclusory allegation that defendants coordinated with one another regarding their response to the protests [was] insufficient to plausibly show the officers reached an agreement"). Plaintiff argues in her opposition to the motion to dismiss that Officer Woolery's involvement on the night of the shooting shows that Officer Woolery reached an understanding to violate Plaintiff's rights, specifically when: (1) Officer Woolery and Detective Neland met at the scene of the shooting, and though they considered placing Plaintiff on an involuntary medical hold, Officer Woolery and Detective Neland ultimately decided that Plaintiff be taken to the police station for interrogation; and (2) Officer Woolery made

a call "to the police station" and shared false information about the trajectory of the bullet, which Detectives Neland and Bedow used during their interrogation of Plaintiff. (Doc. 34 at 10-11.)

These allegations of Officer Woolery's conduct on the night of the shooting are insufficient to plausibly show that he reached an agreement with the other defendants. First, "alleging that two people had the *opportunity* to conspire—i.e., that they could have met with each other, or called each other, or e-mailed each other—is obviously not sufficient to 'nudge' a conspiracy claim 'across the line from conceivable to plausible.'" *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1050 (D. Minn. 2010) (quoting *Twombly*, 550 U.S. at 570) ("It is certainly possible that Officers [] had Lawrence's car towed and blood tested because they had entered into a conspiracy with [another officer]. But it is also possible that they acted on their own to protect a fellow police officer—or that they had entirely legitimate reasons for their actions."). Specifically as to Officer Woolery and Detective Neland's initial interaction wherein they ultimately decided to take Plaintiff to the station for questioning, "allegations that 'defendants formed an agreement or conspired to engage in lawful activities—including lawful investigative activities' are insufficient." *Horocofsky v. City of Lawrence*, 183 F.4th 1227, 1243 (10th Cir. 2026) (quoting *Frasier v. Evans*, 992 F.3d 1003, 1025 (10th Cir. 2021)) (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010)). Finally, Plaintiff does not allege who Officer Woolery spoke to at the police station when he called from the hospital. Even assuming Officer Woolery spoke to Detective Neland or Bedow, that fact does not suggest that Officer Woolery agreed to violate Plaintiff's constitutional rights at that juncture. To the contrary, because according to the Complaint, Officer Woolery's involvement in the investigation was essentially concluded with the phone call to the police station.[8] Thus, to support Plaintiff's conspiracy claim against Officer Woolery, any agreement with Officer Woolery to fail to investigate Tate's death would have necessarily occurred before the phone call to the station. *See Twombly*, 550 U.S. at 557 (holding that conspiracy allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action"); *see e.g.*, *Horocofsky*, 183 F.4th at 1243 (applying the same to § 1983 conspiracy claim); *Jabary v. City of Allen*, 547 Fed. App'x 600, 610-11 (5th Cir. 2013) (same).

[8] Detectives Neland and Bedow continued their investigation, questioning Plaintiff and soon thereafter learning from Dr. Ralston's autopsy on December 13, 2020, that Tate was shot in the right side of the head.

Because Plaintiff has failed to allege facts which suggest that Officer Woolery reached an agreement with the other defendants to deprive Plaintiff of her constitutional rights, Plaintiff's conspiracy claim as alleged against Officer Woolery fails to state a claim. Accordingly, Count 5 as alleged against Officer Woolery is **DISMISSED**.

After careful consideration and for the reasons stated above, Officer Woolery's motion to dismiss, (Doc. 27), is **GRANTED** and Counts 3 and 5 as alleged against Officer Woolery are **DISMISSED**.

**II. Dr. Ralston and Forensic Medical of Kanas, LLC's Motion to Dismiss, (Doc. 32)**

Plaintiff brings two § 1983 claims for fabrication of evidence and civil conspiracy against Dr. Ralston (Counts 4 and 5), as well as a malicious prosecution claim pursuant to state law against both Dr. Ralston and Forensic Medical of Kansas, LLC ("Forensic Medical") (Count 8). Count 4 alleges that Dr. Ralston's autopsy report, which falsely stated that Tate died of a close-range gunshot wound and that his manner of death was homicide, was fabricated and formed the basis of Plaintiff's continued prosecution. Count 5 alleges that Dr. Ralston conspired with Detectives Neland and Bedow to fabricate the autopsy report to match the detectives' theory of the case. Plaintiff claims in Count 8 that Dr. Ralston's intentionally falsified autopsy report constitutes malicious prosecution under Missouri law, as well as Forensic Medical's liability by virtue of respondeat superior. Dr. Ralston and Forensic Medical argue these claims are asserted against "health care providers" for the provision of "health care services," and therefore the claims are (1) barred by the statute of limitations for medical malpractice claims, and additionally (2) subject to dismissal for Plaintiff's failure to timely file a health care provider affidavit as required for medical malpractice claims in Missouri.

Chapter 538, RSMo., provides a civil remedy for medical malpractice, that is, when a plaintiff suffers personal injury or death because a health care provider has failed to exercise "that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession and [] such failure directly caused or contributed to cause the plaintiff's injury or death." Mo. Rev. Stat. 538.210(1). Section 516.105.1 requires that "all actions against physicians . . . and any other entity providing health care services . . . shall be brought within two years from the date of occurrence of the act of neglect complained of[.]"

Dr. Ralston and Forensic Medical argue that because they were "health care providers" and the allegations against them relate to the provision of "health care services" as defined in section

538.205(6)-(7), the two-year medical malpractice statute of limitations (section 516.105.1) applies to the claims alleged against them. According to Dr. Ralston and Forensic Medical, the statute of limitations began to run on April 13, 2021, when Dr. Ralston signed the final autopsy report. Therefore, if Dr. Ralston and Forensic Medical's interpretation is correct, Plaintiff's complaint, filed on December 5, 2025, is untimely.

Dr. Ralston fails to address the abundance of case law regarding § 1983 statute of limitations. While there is no federal statute of limitations applicable to § 1983 claims, the law is clear that courts are to borrow the applicable state statute of limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985); *Owens v. Okure*, 488 U.S. 235, 249-50 (1989) ("[W]here state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions.").

In Missouri, the relevant limitations period for general personal injury torts is five years. Mo. Rev. Stat. § 516.120(4); *see Sulik v. Taney Cnty.*, 393 F.3d 765, 767 (8th Cir. 2005) (applying § 516.120(4)'s five-year statute of limitations to prisoner's § 1983 claims). Dr. Ralston fails to provide any persuasive authority supporting his contention that Missouri's two-year medical malpractice statute of limitations should apply. Other district courts have rejected similar arguments. *See Kitchen v. Miller*, 343 F. Supp. 2d 820, 821-22 (E.D. Mo. 2004) (rejecting doctor's argument that inmate's § 1983 deliberate indifference medical claim was barred by Missouri's medical malpractice two-year statute of limitations and instead concluding that *Wilson* required the court to apply Missouri's personal injury five-year statute of limitations); *Holt by and through Holt v. Glenn*, No. 07-5106-CV-SW-JCE, 2009 WL 10704658, at *2-3 (W.D. Mo. Apr. 2, 2009) (rejecting hospital's argument that deceased inmate's § 1983 claim "sound[ed] in medical malpractice and wrongful death" and was therefore subject to statute of limitations' periods for medical malpractice and wrongful death claims and instead concluding that the personal injury statute of limitations applied); *see also Starks v. St. Louis Cnty.*, No. 4:21-CV-435 RLW, 2022 WL 990678, at *2-3 (E.D. Mo. Apr. 1, 2022) (relying on *Wilson* and *Owens* in rejecting the county's argument that plaintiff's § 1983 claims were "in essence wrongful death claims" and therefore subject to the wrongful death statute of limitations).

Insofar as Dr. Ralston argues that Plaintiff cannot "label" her claims as § 1983 claims in order to escape Missouri's medical malpractice statute of limitations, he does not contend that

Plaintiff's § 1983 fail to state claims as pled. Accordingly, at this juncture, the Court declines to treat the claims, which are very clearly pled as § 1983 fabricated evidence and conspiracy claims, as anything but § 1983 claims. Therefore, the § 1983 claims alleged against Dr. Ralston are subject to Missouri's five-year statute of limitations applicable to personal injury actions. The statute of limitations began to run on April 8, 2024, when Plaintiff was acquitted. *See McDonough v. Smith*, 588 U.S. 109, 125 (2019). Plaintiff's § 1983 claims as alleged against Dr. Ralston and Forensic Medical are timely.

Dr. Ralston and Forensic Medical contend that Plaintiff's state law malicious prosecution claims are subject to § 516.105.1's two-year statute of limitations applicable to medical malpractice claims for the same reasons. However, Missouri law provides for a statute of limitations for malicious prosecution actions. *See* Mo. Rev. Stat. § 516.140. While the length of the limitation periods is the same under both statutes (two years), Missouri's statute of limitations for malicious prosecution actions "begins to run when the plaintiff's right to sue arises, or in other words, when the plaintiff could first maintain his cause of action successfully." *Levy v. Ohl*, 477 F.3d 988, 992 (8th Cir. 2007) (internal quotation marks omitted) ("The claim 'arises when the underlying proceeding forming the basis of the claim terminates in the plaintiff's favor. Termination is effected by a final judgment on the merits, a dismissal by the court with prejudice, or by abandonment of the action.'" (quoting *Arana v. Reed*, 793 S.W.2d 224, 226 (Mo. Ct. App. 1990)). In this case, Plaintiff's malicious prosecution claim began to run on her acquittal date, April 8, 2024. *See id.*; *Linn v. Moffitt*, 73 S.W.3d 629, 633 (Mo. Ct. App. 2002) (citing *Arana*, 793 S.W.2d at 226) (malicious prosecution statute of limitations began to run when plaintiffs were acquitted of criminal charges). Plaintiff's malicious prosecution claims as alleged against Dr. Ralston and Forensic Medical are timely.

For these reasons, Dr. Ralston and Forensic Medical's motion to dismiss is **DENIED**.

## III. Detective Neland's Motion for Judgment on the Pleadings, (Doc. 37)

In Count 4, Plaintiff alleges that Detective Neland "continued a criminal proceeding against [Plaintiff] based on fabricated evidence—namely, the autopsy report that falsely stated Tate died of a close-range gunshot wound and that his death was a homicide." (Doc. 1 at ¶ 270.) Detective Neland argues that Plaintiff has not pled a cognizable fabricated evidence claim against him in Count 4 because the autopsy report was not used at Plaintiff's trial or as justification to arrest her.

Plaintiff counters that she has alleged that the fabricated autopsy report was "created and used to buttress" her false confession, thereby continuing her seizure and prosecution. (Doc. 45 at 4.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." *Manuel v. City of Joliet*, 580 U.S. 357, 367 ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment.").

Detective Neland argues that because the autopsy report was not used at Plaintiff's trial or as justification to arrest her, Plaintiff cannot maintain a fabricated evidence claim as to the autopsy report. Detective Neland contends that he put the autopsy report in a "proverbial drawer," making no further use of it and therefore no constitutional deprivation resulted. Plaintiff alleges that Detective Neland "continued a criminal proceeding" against her based upon the fabricated "autopsy report that falsely stated Tate died of a close-range gunshot wound and that his death was a homicide." (*Id.* at ¶ 270.)

Assuming that a fabricated autopsy report which causes only the *continued prosecution* (rather than to support an arrest warrant or used at trial) violates a criminal defendant's right against unreasonable pretrial restraint, Plaintiff has not alleged that the fabricated autopsy report actually caused her continued prosecution.[9] *See Zutz*, 601 F.3d at 851 ("§ 1983 demands . . . [that] a plaintiff

[9] Plaintiff argues that "Eighth Circuit law explicitly states that continuing a prosecution without probable cause can form a basis for a Fourth Amendment claim." (Doc. 45 at 4). Plaintiff cites only *Hartman v. Bowles*, No. 4:19-cv-02963, 2020 WL 3429136 (E.D. Mo. June 23, 2020), an unpublished district court case. In *Hartman*, the prosecutor dropped charges against the Hartmans for their involvement in a shooting. The detective who investigated the case learned of exonerating information clearing the Hartmans, but he "took no action to end the prosecution." *Id.* at *9. The Hartmans brought § 1983 claims against the detective, including, *inter alia*, claims for "unreasonable continued seizure" after obtaining the exonerating information and "unfair criminal proceedings" in violation of their Fourth Amendment rights. The district court rejected the detective's argument that existence of probable cause negated a claim of unreasonable pretrial restraint, concluding that someone "could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Id.* Therefore, the Hartmans' "continued detention" was a constitutional violation because the detective "did not take any steps to end the prosecution or release the Hartmans despite his knowledge of exonerating information." *Id.* *Hartman* is unhelpful to Plaintiff, as there was no causation issue in *Hartman*—once the prosecutor learned of the exonerating evidence, the prosecutor dismissed the charges.

The Supreme Court has recognized a Fourth Amendment § 1983 malicious prosecution claim after criminal charges were dropped, and it recognized in *dicta* the plausibility of a Fourth Amendment § 1983 claim based upon fabricated evidence which supports a criminal charge that is later dropped. *Chiaverini v. City of Napoleon*, 602 U.S. 556, 563 (2024) ("So if an invalid charge—say, one fabricated by police officers—causes a detention either to start or to continue, then the Fourth Amendment is violated."). *See*

must plead facts that would tend to establish that the defendant's wrongful conducted *caused* the constitutional deprivation."); *Chiaverini v. City of Napoleon*, 602 U.S. 556, 563 (2024).

As alleged by Plaintiff, criminal charges were initiated based solely on her false confession to intentionally shooting Tate "in the face." Detectives Neland and Bedow attended the autopsy conducted by Dr. Ralston on December 13, 2020, but at that point, Plaintiff had already falsely confessed to intentionally shooting Tate, which Detective Neland used as the "sole basis" for obtaining the arrest warrant for Plaintiff. (Doc. 1 at ¶¶ 164, 169-71.) Plaintiff had already been charged with second-degree murder and armed criminal action by the time the autopsy occurred. Plaintiff alleges in a conclusory fashion that the falsified autopsy report, issued after her arrest, "caused [her] prosecution to be continued" because it bolstered her false confession. There are several issues with Plaintiff's causation theory.

First, the autopsy report, which determined that Tate was shot in the right side of his head, did not bolster Plaintiff's false confession that she shot Tate "in the face." (*See* Doc. 1 at ¶ 165 ("[Detectives Neland and Bedow] knew, or should have known, that [Plaintiff's] confession was false because it contradicted the evidence known to them. [Detectives Neland and Bedow] knew that Tate was shot in the temple, not the face, and that the bullet entered one temple and exited the other."). Second, not only does Plaintiff fail to allege facts from which the Court could infer that corroborating evidence was necessary to continue the prosecution (that is, that the prosecutor would have dropped the charges absent corroboration), Plaintiff's allegations suggest that corroboration was not needed. Once Dr. Ralston died, his report was removed from the prosecution's arsenal. Yet, the prosecution continued. The prosecution brought the case to trial using Dr. Peterson's review of Tate's autopsy which did not contain the false conclusions that Tate died of a close-range gunshot wound and that his death was definitively a homicide. As Plaintiff alleges, the "prosecution's only evidence [at trial] was [Plaintiff's] confession." (*Id.* at ¶ 228.) Because Plaintiff has not pled "facts that would tend to establish that [Defendant Neland's] wrongful conducted *caused* the constitutional deprivation," Count 4 fails to allege a Fourth

---

*also Anderson v. Knox Cnty.*, No. 22-5280, 2023 WL 4536078, at *8 n.8 (6th Cir. July 13, 2023) (citing Second, Third, Seventh Circuit cases in noting that the "circuits are split on the issue of whether a plaintiff can bring a fabrication claim after acquittal and what that claim looks like") (pointing out that the Supreme Court has "impliedly recognized fabrication claims based on acquittal" when it held that the statute of limitations for a "§ 1983 claim alleging that [the plaintiff] was prosecuted using fabricated evidence began to run when the criminal proceedings against him terminated in his favor—that is, when he was acquitted at the end of his second trial" (citing *McDonough*, 588 U.S. at 125)).

Amendment violation.[10] *Zutz*, 601 F.3d at 851. Accordingly, Defendant Neland's motion for judgment on the pleadings, (Doc. 37), is **GRANTED**, and Count 4 as alleged against Detective Neland is **DISMISSED**.[11]

## Conclusion

After careful consideration and for the reasons stated above, the Court **ORDERS** that: (1) Officer Woolery's motion to dismiss, (Doc. 27), is **GRANTED** and Counts 3 and 5 as alleged against Officer Woolery are **DISMISSED**; (2) Dr. Ralston and Forensic Medical's motion to dismiss, (Doc. 32) is **DENIED**; (3) Detective Neland's motion for partial judgment on the pleadings, (Doc. 37), is **GRANTED** and Count 4 as alleged against Detective Neland is **DISMISSED**; and (4) Detective Neland's motion for leave to file supplemental briefing, (Doc. 56), is **DENIED as moot**.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: September 15, 2026

[10] Although Plaintiff's opposition to Detective Neland's motion for judgment on the pleadings identifies her claim as arising under the Fourth Amendment, Plaintiff cites both the Fourth and Fourteenth Amendments as basis for her § 1983 fabricated evidence claim in the Complaint. (*See* Doc. 1 at p. 45, ¶ 273 (alleging Plaintiff "was unreasonably and unlawfully *deprived of her liberty* by being subjected to criminal prosecution and wrongful incarceration for a period of more than 3 years" (emphasis added)). "Any deprivation of [Plaintiff's] liberty before [her] criminal trial" based upon fabricated evidence, "however, is governed by the Fourth Amendment and its prohibition on unreasonable seizures." *Johnson v. McCarver*, 942 F.3d 405, 410-411 (8th Cir. 2019) (citing *Manuel*, 580 U.S. at 364).

To the extent that Count 4 could be construed as a substantive due process claim pursuant to the Fourteenth Amendment, Plaintiff would face the same causation hurdle. *See Winslow*, 696 F.3d at 732 ("False evidence . . . only violates a criminal [defendant's] due process rights if it is 'used to deprive the defendant of her liberty in some way.' Indeed, 'if an officer . . . fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest.'" (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580, 582 (7th Cir. 2012)); *see also Johnson*, 942 F.3d at 411 ("Any *post-trial* claim based on the alleged false report requires a showing that the report was used to deprive [criminal defendant] of liberty in some way.") (finding no due process violation based upon fabricated evidence because § 1983 plaintiff was acquitted and "he suffered no deprivation of liberty after the trial").

[11] Detective Neland filed a motion for leave to supplement her briefing on the motion for partial judgment on the pleadings, seeking to include an admission Plaintiff made in the underlying criminal matter. Detective Neland avers that she was unaware of the admission until Plaintiff produced the criminal case records on March 18, 2024. Plaintiff opposes the motion for leave. The motion for leave is **DENIED as moot**—Detective Neland's motion for judgment on the pleadings is meritorious even without the additional information, which was not considered by the Court.